# No. 24-1882

## IN THE UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF SOUTH CAROLINA,

*Plaintiff-Appellant,*

v.

BRYAN STIRLING, in his official capacity as director of the South Carolina Department of Corrections,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of South Carolina
No. 3:24-cv-00906-JDA
Hon. Jacqueline D. Austin

## OPENING BRIEF OF PLAINTIFF-APPELLANT

Allen Chaney
ACLU of South Carolina
P.O. Box 1668
Columbia, SC 29202
achaney@aclusc.org

Emerson Sykes
ACLU
125 Broad Street, 18th Floor
New York, NY 11230
esykes@aclu.org

David Fathi
ACLU National Prison Project
915 15th Street NW, 7th Floor
Washington, DC 20005
dfathi@aclu.org

Corene Kendrick
ACLU National Prison Project
425 California St., Ste 700
San Francisco, CA 94104
ckendrick@aclu.org

*Counsel for Plaintiff-Appellants*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Fourth Circuit Local Appellate Rule 26.1, Plaintiff-Appellant states that it is not a publicly held corporation, other publicly held entity, or trade association; that it does not issue shares to the public and has no parent companies, subsidiaries, or affiliates that have issued shares to the public in the United States or abroad; that no publicly held corporation or other publicly held entity has a direct financial interest in the outcome of the litigation; and that the case does not arise out of a bankruptcy proceeding.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..........................................II

TABLE OF AUTHORITIES ............................................................. V

INTRODUCTION ............................................................................. 1

JURISDICTIONAL STATEMENT ....................................................3

STATEMENT OF ISSUES ...............................................................4

STATEMENT OF THE CASE ..........................................................4

    I.      Brief Summary & Procedural History ....................................4

    II.     Statement of Facts ............................................................6

      A.     SCDC's Categorical Ban on Interviews and Publication ...6

      B.     Enforcement of the Challenged Policy ..............................7

      C.     Plaintiff ACLU of South Carolina's Planned Activities .....8

          1.     Sofia Cano ...............................................................10

          2.     Marion Bowman, Jr. ................................................11

STANDARD OF REVIEW ...............................................................13

SUMMARY OF ARGUMENT .........................................................13

ARGUMENT ..................................................................................16

    I.      ACLU-SC stated plausible claims for relief under the First
         Amendment. ....................................................................16

      A.     The challenged policy infringes on the First Amendment
          rights of ACLU-SC ........................................................18

      B.     The challenged policy fails First Amendment scrutiny. ...21

1.      Applying the facts alleged in Plaintiff's Complaint, the challenged policy fails scrutiny under *Martinez*. 22

2.      Applying the facts alleged in Plaintiff's Complaint, the challenged policy also fails scrutiny under *Turner*. ...................................................................27

C.      The district court wrongly dismissed ACLU-SC's as-applied challenge. ...........................................................33

D.      The district court wrongly dismissed ACLU-SC's facial challenge. ..................................................................36

1.      Plaintiff's facial challenge demands separate consideration. ...............................................................37

2.      The challenged policy is facially overbroad in violation of the First Amendment. ...........................38

II.     The Court should grant a preliminary injunction allowing ACLU-SC to record and publish the speech of its condemned client, Marion Bowman, Jr. .................................................41

A.      ACLU-SC is likely to prevail on the merits......................42

1.      The "victims' rights" justification cannot satisfy any level of scrutiny...........................................................43

2.      Stirling's generalized, *post hoc* justifications cannot justify the policy's application to ACLU-SC and Mr. Bowman. .................................................................43

B.      Plaintiffs established they are likely to suffer irreparable harm absent preliminary relief. ......................................50

C.      Plaintiffs established both that the balance of equities and the public interest favor preliminary injunctive relief....50

CONCLUSION ..................................................................52

iv

# TABLE OF AUTHORITIES

## Cases

*ACLU of Ill. v. Alvarez*, 679 F.3d 583 (7th Cir. 2012) ...................... 36, 42

*Ali v. Dixon*, 912 F.2d 86 (4th Cir. 1990) ................................................ 47

*Armstrong v. Davis*, 275 F.3d 849 (9th Cir. 2001) ............................ 15, 49

*Bartnicki v. Vopper*, 532 U.S. 514 (2001) .......................................... 14, 42

*Billups v. City of Charleston, S.C.*, 961 F.3d 673 (4th Cir. 2020) .. *passim*

*Brown v. Ent. Merchants Ass'n*, 564 U.S. 786 (2011) ............................ 24

*Campos v. Coughlin*, 854 F. Supp. 194 (S.D.N.Y. 1994) ................. 15, 45

*Canadian Coal. Against the Death Penalty v. Ryan*, 269 F. Supp. 2d 1199 (D. Ariz. 2003) ........................................................................ 24

*Carolina Youth Action Project; D.S. by & through Ford v. Wilson*, 60 F.4th 770 (4th Cir. 2023) ................................................................ 20

*Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184 (4th Cir. 2013) ...... 51

*Cf. Miller-El v. Cockrell*, 537 U.S. 322 (2003) ....................................... 49

*City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750 (1988) ........ 44

*Clark v. Cmty. for Creative Non–Violence,* 468 U.S. 288 (1984) ............. 16

*Cohen v. California*, 403 U.S. 15 (1971) ........................................... 29, 40

*Connection Distrib. Co. v. Reno*, 154 F.3d 281 (6th Cir. 1998) .............. 51

*Cornelio v. Conn.*, 32 F.4th 160 (2d Cir. 2022) ...................................... 45

*Cornelius v. NAACP Legal Def. & Educ. Fund,* 473 U.S. 788 (1985) ................................................................................................. 16, 17

*Covey v. Assessor of Ohio Cnty.*, 777 F.3d 186 (4th Cir. 2015) ......... 13, 22

*Coward v. Robinson*, 276 F. Supp. 3d 544 (E.D. Va. 2017) ................... 26

*Elrod v. Burns*, 427 U.S. 347 (1976) ...................................... 50

*Firewalker-Fields v. Lee*, 58 F.4th 104 (4th Cir. 2023) .............. 14, 43, 47

*Fusaro v. Cogan*, 930 F.3d 241 (4th Cir. 2019) ...................................... 17

*Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507 (4th Cir. 2002) .......... 51

*Haight v. Thompson*, 763 F.3d 554 (6th Cir. 2014) ................................ 45

*Heyer v. United States Bureau of Prisons*, 849 F.3d 202 (4th Cir. 2017) ................................................................... 21, 29, 31

*Holt v. Hobbs*, 574 U.S. 352 (2015) ........................................ 24

*Houchins v. KQED, Inc.*, 438 U.S. 1 (1978) ................................ 5, 33, 37

*Hum. Rts. Def. Ctr. v. Sw. Va. Reg. Jail Auth.*, 396 F. Supp. 3d 607 (W.D. Va. 2019) ........................................................... 30

*In re Murphy-Brown, LLC*, 907 F.3d 788 (4th Cir. 2018) ...................... 50

*In re Primus*, 436 U.S. 412 (1978) ......................................... 19

*In re Search Warrant Issued June 13, 2019*, 942 F.3d 159 (4th Cir. 2019) ....................................................................... 41

*Jewell v. Gonzales*, 420 F. Supp. 2d 406 (W.D. Pa. 2006) ..................... 29

*Joelner v. Vill. of Wash. Park, Ill.*, 378 F.3d 613 (7th Cir. 2004) .......... 51

*Johnson v. Bergland*, 586 F.2d 993 (4th Cir. 1978) .......................... 15, 50

*Jones v. N.C. Prisoners' Lab. Union*, 433 U.S. 119 (1977) .................... 28

*Jordan v. Pugh*, 504 F. Supp. 2d 1109 (D. Colo. 2007) ....................... 22

*Kenny v. Wilson*, 885 F.3d 280 (4th Cir. 2018) .............................. 20

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330 (4th Cir. 2021) ..................................................... 41, 51

*League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224
   (4th Cir. 2014) ................................................................. 13

*Lumumba v. Kiser*, --- F.4th ----, 2024 WL 4097525 (4th Cir. Sept.
   6, 2024) ........................................................................ 40

*McCullen v. Coakley*, 573 U.S. 464 (2014) ............................. 25

*Morrison v. Garraghty*, 239 F.3d 648 (4th Cir. 2001) .............. 27

*Morrison v. Hall*, 261 F.3d 896 (9th Cir. 2001) ...................... 28

*N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483 (2d Cir. 2013) ........ 51

*Near v. Minnesota*, 283 U.S. 697 (1931) ................................. 19

*Nolan v. Fitzpatrick*, 451 F.2d 545 (1st Cir. 1971) ................ 40

*Overton v. Bazzetta*, 539 U.S. 126 (2003) ............................... 32

*Pell v. Procunier*, 417 U.S. 817 (1974) ............................. *passim*

*People for the Ethical Treatment of Animals, Inc. v. N.C. Farm
   Bureau Fed'n, Inc.*, 60 F.4th 815 (4th Cir. 2023) ............. 14, 19, 33, 42

*Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012) ......... 51

*Phelps-Roper v. Nixon*, 545 F.3d 685 (8th Cir. 2008) ............. 51

*Pollack v. Reg'l Sch. Unit 75*, 12 F. Supp. 3d 173 (D. Me. 2014) 16, 17, 42

*Prison Legal News v. Stolle*, 319 F. Supp. 3d 830 (E.D. Va. 2015) ........ 49

*Procunier v. Martinez*, 416 U.S. 396 (1974) ................................. *passim*

*Quinn v. Nix*, 983 F.2d 115 (8th Cir. 1993) ........................... 46

*Reed v. Faulkner*, 842 F.2d 960 (7th Cir. 2001) ...................... 49

*Republican Party of N.C. v. Martin*, 980 F.2d 943 (4th Cir. 1992) ........ 13

*Saxbe v. Wash. Post Co.*, 417 U.S. 843 (1974) ........................ 5, 30, 33, 37

*Shaw v. Hunt*, 517 U.S. 899 (1996) ....................................... 45

*Shimer v. Washington*, 100 F.3d 506 (7th Cir. 1996) ............................ 49

*Sisney v. Kaemingk*, 15 F.4th 1181 (8th Cir. 2021) ................................ 37

*Smith v. Daily Mail Publishing Co.*, 443 U.S. 97 (1979) ....................... 20

*Snyder v. Phelps*, 562 U.S. 443 (2011) ................................................... 23

*Stuart v. Camnitz*, 774 F.3d 238 (4th Cir. 2014) ................................... 17

*Swift v. Lewis*, 901 F.2d 730 (9th Cir. 1990) ................................... 44, 46

*Thomas v. Andino*, 613 F. Supp. 3d 926 (D.S.C. 2020) .......................... 51

*Thornburgh v. Abbott*, 490 U.S. 401 (1989) .................................... 21, 22

*Turner v. Safley*, 482 U.S. 78 (1987) .............................................. *passim*

*United States v. Hansen*, 599 U.S. 762 (2023) ........................... 37, 38, 39

*United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803 (2000) ......... 23, 46

*United States v. Virginia*, 518 U.S. 515 (1996) ............................... 15, 43

*Washington Post v. McManus*, 944 F.3d 506 (4th Cir. 2019) ................. 24

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .............. *passim*

*Yellowbear v. Lampert*, 741 F.3d 48 (10th Cir. 2014) ....................... 26, 27

## Statutes

28 C.F.R. § 540 ....................................................................................... 48

28 U.S.C. § 1291 ........................................................................................ 3

28 U.S.C. § 1292 ........................................................................................ 3

28 U.S.C. § 1331 ........................................................................................ 3

42 U.S.C. § 1983 ........................................................................................ 3

## <u>Other Authorities</u>

1 Smolla & Nimmer on Freedom of Speech §§ 4.18-19 .......................... 23

*A 50 State Prison Policy Analysis on Media Access* .................... 24, 25, 26

Ellerbeck & Asher-Schapiro, *Amid nationwide strike, media access to prisons is limited*, Columbia Journ. Rev. (Sept. 6, 2018) ............... 24

S.C. Const. art. IV, § 14 ........................................................................ 12

SCDC Policy GA-02.01 ............................................................................ 6

# INTRODUCTION

Plaintiff-Appellant ACLU of South Carolina (ACLU-SC) seeks, among other things, to record and publish a conversation with Marion Bowman—an incarcerated person who Defendant-Appellee Bryan Stirling plans to execute on November 29, 2024. The interview would detail Mr. Bowman's experience on death row, in his own words, and discuss his petition for executive clemency. ACLU-SC is allowed to conduct the interview, but it is prohibited from recording or publishing it under a South Carolina Department of Corrections (SCDC) policy that categorically bans the publication of prisoners' speech.

The breadth of the challenged policy is unparalleled. Unique among prison systems nationwide, SCDC takes the categorical position that "[i]nmates lose the privilege of speaking to the news media when they enter SCDC." To that end, SCDC bans media interviews on any topic and by any real-time means: in person, by video, or by phone. Only correspondence by mail is allowed. It is also enforced against anyone— not just members of the press—who seeks to publicly disseminate prisoner speech, including family, friends, and attorneys. Finally, the policy prohibits the publication of any prisoner's speech, no matter the topic.

Before the filing of this lawsuit, Defendant Stirling and SCDC insisted that the policy is designed to protect crime victims from being

upset by the speech of incarcerated people. But he now argues that the policy should survive scrutiny because of ten, generically defined, "adverse consequences" that could theoretically arise if restrictions on "communication between inmates and the general public" were "eliminated." So far, Stirling has not identified the "actual interests" that underlie SCDC's policy, described how ACLU-SC's planned activities implicate those interests, or explained why SCDC—unlike every other prison system in the country—enforces such a sweeping ban on protected speech.

Below, the district court correctly concluded that ACLU-SC alleged a "credible threat of enforcement in regard to its First Amendment-protected Planned Activities," but then denied a preliminary injunction and dismissed the case without applying *any* First Amendment scrutiny. Under this Court's precedent, that was a legal error. *See Billups v. City of Charleston, S.C.*, 961 F.3d 673, 682 (4th Cir. 2020) (internal citations omitted). Whether analyzed under *Procunier v. Martinez*, 416 U.S. 396 (1974), or *Turner v. Safley*, 482 U.S. 78 (1987), Defendant Stirling's justification for the challenged policy— that it protects crime victims from being exposed to potentially upsetting prisoner speech—fails scrutiny. Whatever deference is generally owed to prison regulations, a blanket prohibition on recording or publishing prisoner speech cannot be justified by the mere *possibility* that some third party *might* hear it and be offended.

In addition to vacating the district court's order dismissing the case, this Court should also issue a preliminary injunction allowing ACLU-SC to record and publish an interview with Mr. Bowman. There is no need to remand for further consideration when, as here, the undisputed record establishes each *Winter* factor. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Though the district court made no factual findings about the new justifications Defendant Stirling proffered in response to this lawsuit, none are even alleged to be the "actual interest" driving the policy, and none can justify prohibiting ACLU-SC's planned activities. Most critically, the looming execution of Mr. Bowman sharpens ACLU-SC's need for immediate relief from the unlawful censorship imposed here by SCDC.

## JURISDICTIONAL STATEMENT

Plaintiffs filed this action under 42 U.S.C. § 1983, and the district court properly exercised jurisdiction under 28 U.S.C. § 1331. Plaintiffs filed a timely notice of appeal on September 9, 2024. JA194. The Court therefore has jurisdiction to review the district court's order dismissing the case under 28 U.S.C. § 1291 and to review the district court's order denying a preliminary injunction under 28 U.S.C. § 1292(a)(1).

# STATEMENT OF ISSUES

I.      To avoid upsetting crime victims, SCDC prohibits all real-time press interviews and prohibits any publication of prisoners' speech, by anyone, no matter the topic.

> a.  Does the policy's restriction on publishing the speech of prisoners violate ACLU-SC's First Amendment right to record and publish the speech of its incarcerated clients?
>
> b.  Does the policy facially violate the First Amendment under *Martinez* and/or *Turner*?

II.     Defendant Stirling has never explained what harm, if any, would result if ACLU-SC recorded and published a conversation with Mr. Bowman, a man set to be executed on November 29, 2024. Does the record on appeal establish that ACLU-SC is entitled to preliminary injunctive relief regarding its planned activities with Mr. Bowman?

# STATEMENT OF THE CASE

## I.      Brief Summary & Procedural History

ACLU-SC filed this action in February of 2024. JA6. It alleged that SCDC, through Defendant Stirling, categorically bans recording and publishing the speech of incarcerated people, even in written form. In its Complaint, ACLU-SC alleged that the policy facially violates the First Amendment and also violates the First Amendment as applied to ACLU-SC's plans to record and publish the speech of two incarcerated

clients—Sofia Cano and Marion Bowman. Immediately after filing its Complaint, ACLU-SC moved for a preliminary injunction. JA18.

In duplicate filings, Defendant Stirling opposed a preliminary injunction and moved to dismiss. JA97. On the facts, he agreed that SCDC prohibits all real-time interviews between prisoners and the press and prohibits anyone with access, including attorneys and family members, from recording or publishing the speech of incarcerated people. Nonetheless, Stirling argued that ACLU-SC lacked standing to bring the suit and that its claims were foreclosed by *Pell v. Procunier*, 417 U.S. 817 (1974), *Saxbe v. Wash. Post Co.*, 417 U.S. 843 (1974), and *Houchins v. KQED, Inc.*, 438 U.S. 1 (1978), a trilogy of Supreme Court opinions holding that the press does not have a special First Amendment right to physically enter prison facilities for newsgathering purposes.

On August 13, 2024, Plaintiff moved for expedited consideration of its motion for preliminary injunction. JA167. Plaintiff explained that because the South Carolina Supreme Court affirmed the constitutionality of lethal injection, the electric chair, and the firing squad, the State was suddenly set to resume executions. ACLU-SC argued that "[w]ithout immediate relief from this Court, Plaintiff's First Amendment rights to receive, record, and publish the speech of Marion Bowman in furtherance of his clemency petition will be permanently and incurably violated." JA168.

5

The district court issued its opinion and order on August 30, 2024. JA176. The court refused to dismiss for lack of standing, holding that ACLU-SC satisfied the Article III standing requirements by alleging a "credible threat of enforcement in regard to its First Amendment-protected Planned Activities." JA185. Despite that, the court concluded that "it need not reach the issues of which level of scrutiny applies and whether the Policy passes such scrutiny." JA191. Instead, it ruled that because "it is clear that the relief Plaintiff actually seeks in its Complaint is *access* to create such recordings for the purpose of later publication," its claims failed under *Pell* and its progeny. JA191. As a result, it denied Plaintiff's motion for preliminary injunction and entered a final judgment dismissing the case with prejudice. JA193.

This appeal followed.

## II.    Statement of Facts

### A.    SCDC's Categorical Ban on Interviews and Publication

Prisoners' access to media interviews is governed by SCDC Policy GA-02.01, "Employee and Inmate Relations with News Media, Legislators, and Others." JA54. Under GA-02.01.8, "personal contact interviews with any SCDC inmate, untried county safekeeper, or death row inmate by anyone will be prohibited." JA54 (emphasis added.) Though the text of the policy prohibits only "personal contact interviews," SCDC more recently has construed that language as also

6

prohibiting incarcerated people from being interviewed via video or telephone. JA60 (SCDC Press Release). And although prisoners can write letters to the press, SCDC prohibits the publication of those letters. JA61 (quoting Defendant Stirling saying that "inmates . . . are *not allowed* to publish their own writings in media outlets"). In a press release issued by SCDC on August 30, 2023, it left no question about the categorical nature of its interview ban: "Inmates lose the privilege of speaking to the news media when they enter SCDC." JA60.

According to Defendant Stirling, the purpose of SCDC's interview ban is to ensure a victim of a crime is not exposed to the speech or expression of the crime's perpetrator. In an interview with The Post and Courier, he asserted that SCDC's interview ban is "rooted in victims' rights," and that "we don't think victims should have to see the person who harmed them or their family members on the evening news." JA62.

## B.     Enforcement of the Challenged Policy

On June 10, 2023, Richard Alexander ("Alex") Murdaugh, a former South Carolina attorney who has been convicted of murder and is now incarcerated at SCDC, spoke by phone with his attorney, Jim Griffin. During the call, Mr. Murdaugh described his time in custody at SCDC and read a portion of his journal. Griffin recorded portions of that phone call and later provided the recordings to Fox Nation for inclusion in a docu-series, "The Fall of the House of Murdaugh." *See* JA60, JA61.

Notably, neither the call itself nor the information it contained implicated prison security in any way.

SCDC concluded that Mr. Murdaugh and Mr. Griffin's conversation "violate[d] SCDC's inmate interview policy," because "[i]nmates in the custody of the [SCDC] are not allowed to participate in interviews of this nature." JA66. As soon as SCDC found out about the publication of the recorded material, but before it conducted an investigation, SCDC revoked Murdaugh's tablet and phone privileges. JA60.

On top of punishing Mr. Murdaugh, SCDC sent a letter to attorney Mr. Griffin advising him that his actions were prohibited by SCDC policy and "could jeopardize [Griffin's] telephonic communications with [Murdaugh] in the future." JA66. The threat of further enforcement could not have been clearer, with SCDC stating that it was "hopeful that this letter will put you [Mr. Griffin] on notice and caution you to refrain from further actions of this nature." JA66.

C.    Plaintiff ACLU of South Carolina's Planned Activities

Plaintiff ACLU-SC has a long history of advocating on behalf of its clients and other incarcerated people in South Carolina. As part of its work, ACLU-SC regularly visits and calls people in SCDC custody. JA48. ACLU-SC also conducts extensive public advocacy on behalf of its clients and, more broadly, in pursuit of civil rights and civil liberties of

all people in the state. JA48–49. ACLU-SC's public advocacy and education use all forms of traditional and digital media and include both direct publication and publication through other media outlets. But for the interview ban, ACLU-SC would record and publish interviews with incarcerated people on many topics, as do other ACLU affiliates nationwide. JA51; *see also, e.g.*, "Ronald Johnson," ACLU of Colorado (available at: https://www.youtube.com/watch?v=bUMtgiiOxxA&t=274s) (sharing about an incarcerated person during COVID-19 and including audio recording of his voice).

ACLU-SC has a plan to publish recorded audio interviews with at least two clients in written and podcast form. JA50–51. The interviews would be conducted by ACLU-SC Communications Director Paul Bowers, an experienced and award-winning journalist. JA48. As a member of ACLU-SC staff, Mr. Bowers is responsible for the organization's multimedia advocacy and storytelling. He writes press releases, blogs, and news articles; conducts and publishes interviews; and has started recording a podcast to better platform the stories and viewpoints of impacted individuals throughout South Carolina. JA48–49. As part of his efforts, he works directly with incarcerated people in South Carolina's prisons.

For example, in October 2023, Bowers interviewed Brittany Martin—a Black woman wrongfully convicted and sentenced to four

years in prison for her participation in a nonviolent Black Lives Matter protest in Sumter—and published a blog post about her case. JA49. That blog is full of direct quotes from Ms. Martin and has been viewed over 2,200 times on ACLU-SC's website. JA49. The only reason this interview was published with direct quotes from Ms. Martin is because she is held in the State of Illinois. JA49. If Ms. Martin were held at SCDC, she would have been subject to discipline because of the direct publication of her words, and ACLU-SC would not have published the blog. JA49.

ACLU-SC currently represents two individuals in SCDC custody who urgently want to tell their stories publicly.

### 1.    Sofia Cano

Sofia Cano is a transgender woman incarcerated at SCDC. JA49–50. She was first incarcerated at age 13, and at age 16 began to experience deep incongruence with her assigned gender. JA49. When she was 18, she began discussing her gender identity issues and resulting distress with mental health professionals at SCDC. JA49–50. Eventually, SCDC mental health providers diagnosed her with gender dysphoria. JA50. Because of her gender dysphoria, Ms. Cano has experienced suicidal ideation and has attempted auto-castration. JA50. Prevailing medical standards provide that SCDC should provide her hormone therapy, but it refuses to provide that treatment. JA50.

Because of her untreated gender dysphoria, Ms. Cano has continued to endure serious distress. JA50. Plaintiff ACLU-SC represents Ms. Cano in a lawsuit challenging SCDC's denial of care under the Eighth Amendment and under Title II of the Americans with Disabilities Act (ADA). JA50. As part of that representation, Plaintiff has access to Ms. Cano by telephone and through in-person visitation. JA50.

At present, ACLU-SC is heavily involved in debates at the South Carolina Statehouse over the legality and advisability of state-imposed restrictions on transgender healthcare. To help South Carolinians make an informed decision about the propriety of such bans, ACLU-SC would like to exercise its First Amendment right to share the speech of its client, Sofia Cano, with the public. Specifically, ACLU-SC seeks to share the effect of SCDC's inhumane denial of treatment in Ms. Cano's own words. JA50.

## 2. Marion Bowman, Jr.

Marion Bowman, Jr. is a man held on SCDC's death row. JA12, JA50. Defendants have scheduled his execution for November 29, 2024.[1] JA50. Mr. Bowman has exhausted his appeals and postconviction claims and is now preparing to petition for executive clemency. JA50.

---

[1] *See* Death Penalty Information Center, *Dismissing Codefendant's Last-Minute Admission that Khalil Allah Was not Present at the Crime Scene, South Carolina Supreme Court Clears War for Today's Execution* (Sept. 20, 2024) (available at: https://deathpenaltyinfo.org/dismissing-codefendants-last-minute-admission-that-khalil-allah-was-not-present-at-the-crime-scene-south-carolina-supreme-court-clears-way-for-todays-execution).

Under the South Carolina Constitution, the Governor has authority to commute a sentence of death to a sentence of life imprisonment. S.C. Const. art. IV, § 14. The decision to grant or deny clemency is discretionary, and the Governor's decision is accountable only to the political process.

ACLU-SC's advocacy includes death penalty abolition, clemency, and improving prison conditions. JA48. As part of that advocacy, ACLU-SC is working with Mr. Bowman to help him raise awareness about his case and about what life is like on death row in South Carolina. JA50. The goal of publishing Mr. Bowman's story is to increase political pressure in favor of clemency, to highlight the human costs of capital punishment, and to inform the public about the inhumane treatment endured by people incarcerated at SCDC. Plaintiff has access to Mr. Bowman by telephone, video calls, and through in-person visitation. JA13. But under the challenged policy, Plaintiff is prohibited from recording its phone and video calls with Mr. Bowman for the purpose of publication or otherwise publishing Mr. Bowman's speech. JA51.

A story *about* Marion Bowman is not equivalent to a story *by* Marion Bowman, in his own words, speaking directly to the Governor and the people of South Carolina, in whose name he will be killed. JA13. With his death scheduled for eight weeks from the date of this brief, there is great urgency to record an interview with Mr. Bowman

and publish it, before he is executed and while it still might help spare his life.

## STANDARD OF REVIEW

A Rule 12(b)(6) motion "tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). This Court "review[s] a district court's grant of a motion to dismiss *de novo*. In deciding such a motion, [the court] accept[s] as true all of the factual allegations contained in the complaint, and draw[s] all reasonable inferences in favor of the plaintiff." *Covey v. Assessor of Ohio Cnty.*, 777 F.3d 186, 191–92 (4th Cir. 2015) (internal quotations omitted).

The Fourth Circuit reviews the denial of a preliminary injunction "for abuse of discretion, reviewing the district court's factual findings for clear error and . . . its legal conclusions *de novo*." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 235 (4th Cir. 2014) (internal citations omitted). Abuse of discretion occurs when a district court "misapprehends or misapplies the applicable law." *Id.*

## SUMMARY OF ARGUMENT

**I.**     Accepting Plaintiff's well-pleaded facts as true, SCDC's policy violates the First Amendment both on its face and as applied to ACLU-SC.

13

The challenged policy injures ACLU-SC and triggers First
Amendment scrutiny by interfering with ACLU-SC's right to record
communications with willing and accessible interviewees, *see People for
the Ethical Treatment of Animals, Inc. v. N.C. Farm Bureau Fed'n, Inc.*,
60 F.4th 815, 827 (4th Cir. 2023) ("*PETA*"); to publish the speech that it
lawfully receives, *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001); and to
receive information from willing speakers at SCDC, *Martinez*, 416 U.S.
at 408 ("[C]ensorship of the communication between [a prisoner and
someone else] necessarily impinges on the interests of each."). And
because SCDC's only justification for the policy—that it protects crime
victims from potentially observing theoretically upsetting content—is
anathema to First Amendment principles and is wholly unrelated to
security, rehabilitation, or any other penological justification, the policy
fails scrutiny under both *Martinez* and *Turner*.

**II.**    ACLU-SC is entitled to a preliminary injunction that, at
minimum, permits it to record and publish interviews with its client,
Marion Bowman, in support of both Mr. Bowman's clemency petition
and ACLU-SC's own anti-death penalty advocacy. *See Winter v. Nat.
Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

ACLU-SC is likely to prevail on the merits because Defendant
Stirling failed to "put forward the *actual interests* that support [his]
policy," *Firewalker-Fields v. Lee*, 58 F.4th 104, 116 (4th Cir. 2023)
(emphasis added), or even offer a single, responsive justification for

prohibiting ACLU-SC from publishing an interview with Marion Bowman. As other courts have cautioned, "[d]efendants cannot merely brandish the words 'security' and 'safety' and expect that their actions will automatically be deemed constitutionally permissible conduct." *Campos v. Coughlin*, 854 F. Supp. 194, 207 (S.D.N.Y. 1994). Yet that is precisely what Stirling has done here, defending the challenged policy exclusively with "reflexive, rote assertions," *Armstrong v. Davis*, 275 F.3d 849, 874 (9th Cir. 2001), that were "hypothesized or invented *post hoc* in response to litigation," *United States v. Virginia*, 518 U.S. 515, 533 (1996). As this Court has held, more is required to justify the serious deprivation of ACLU-SC's rights.

The remaining *Winter* factors also support preliminary injunctive relief. First Amendment harms are definitionally irreparable, *Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir. 1978), and Mr. Bowman's looming execution renders the requested relief, if granted on a later date, entirely meaningless. Likewise, the balance of hardships tips strongly in Plaintiff's favor. On one side of the scale, ACLU-SC risks permanently losing its chance to engage in core First Amendment conduct regarding a matter of grave public concern; and on the other, SCDC risks nothing. Indeed, even when confronted with ACLU-SC's narrowest request for relief, Defendant Stirling never explained what harm—if any—would result from granting ACLU-SC permission to

15

record and publish an interview with Mr. Bowman in support of his clemency petition. *See, e.g.*, JA170–175.

## ARGUMENT

### I.    ACLU-SC stated plausible claims for relief under the First Amendment.

"Generally speaking, a First Amendment challenge proceeds in three steps." *Pollack v. Reg'l Sch. Unit 75*, 12 F. Supp. 3d 173, 197–98 (D. Me. 2014) (citing *Cornelius v. NAACP Legal Def. & Educ. Fund,* 473 U.S. 788, 797 (1985)).

*First*, the plaintiff bears an initial burden to "demonstrate that the First Amendment even applies." *Clark v. Cmty. for Creative Non–Violence,* 468 U.S. 288, 293 n.5 (1984). If it does not, the court "need go no further." *Cornelius*, 473 U.S. at 797. But "[i]f a protected First Amendment right is involved," the court is "obliged to then assess whether the governmental action in question infringes that right." *Billups, S.C.*, 961 F.3d at 682.

*Second*, the court must consider the nature and circumstances of the First Amendment conduct and "determine[] the applicable level of scrutiny." *Id.* at 684. As this Court has explained, "First Amendment protects speech along a spectrum, so that '[l]aws that impinge upon speech receive different levels of judicial scrutiny depending on the type of regulation and the justifications and purposes underlying it.'" *Fusaro*

*v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019) (quoting *Stuart v. Camnitz*, 774 F.3d 238, 244 (4th Cir. 2014)).

*Third*, the court must determine "whether the government's justifications for restricting the conduct or speech satisfy the applicable standard or standards." *Pollack*, 12 F. Supp. 3d at 198 (citing *Cornelius*, 473 U.S. at 797). If a case may be resolved without making a final determination about the level of scrutiny that applies—for example, where the state action fails even the weaker degree of scrutiny—the Court can resolve the matter without deciding the second step. *See Billups*, 961 F.3d at 685 ("[T]he Ordinance cannot survive even intermediate scrutiny. Because we therefore can resolve this appeal without deciding the content-neutrality question, we decline to rule thereon.").

The district court disregarded this analytical process, and that failure is reversable error. Although it correctly held (as a matter of standing) that ACLU-SC plausibly alleged that the challenged policy chilled its "First Amendment-protected Planned Activities," JA185, the district court failed to "determine[] the applicable level of scrutiny," *Billups*, 961 F.3d at 684, or analyze "whether the government's justifications for restricting the conduct or speech satisfy the applicable standard or standards," *Pollack*, 12 F. Supp. 3d at 198 (internal citation omitted).

The district court's error produced the wrong result. Under any established standard, ACLU-SC stated two plausible claims for relief. First, it plausibly alleged that the challenged policy chilled its First Amendment rights and that Defendant's Stirling's justification for the policy cannot survive *any* level of First Amendment scrutiny. Second, ACLU-SC plausibly alleged that the challenged policy is facially overbroad in violation of the First Amendment.

A.    The challenged policy infringes on the First Amendment rights of ACLU-SC.

ACLU-SC seeks to record and publish the speech of incarcerated individuals, including two of its incarcerated clients—Marion Bowman and Sofia Cano. For Mr. Bowman, ACLU-SC seeks to record and publish information about Mr. Bowman's experiences on death row and to amplify his plea for executive clemency. JA12–13. For Ms. Cano, ACLU-SC seeks to record and publish Ms. Cano's harrowing experience of fighting for medically treatment for her gender dysphoria while incarcerated at SCDC. JA11–12. Further, ACLU-SC asserts that it has an organizational interest in publishing these stories in furtherance of its own advocacy against capital punishment, in support of prisoners' rights, and other causes. JA12–13.

As Plaintiff made clear below, "ACLU-SC does *not* seek to vindicate an injury to its access. Rather, ACLU-SC seeks relief from SCDC's suppression of its First Amendment expressive activities during

18

and after its client meetings." JA42. Plaintiff's Complaint asserts that it already "*has access* to Mr. Bowman by telephone, video calls, and through in-person visitation," "*has access* to Ms. Cano by telephone and through in-person visitation," and "*has* the technical capacity to record its phone and video calls." JA12–13 (emphasis added). But out of credible fear of reprisal under the challenged policy, ACLU-SC has refrained from recording or publishing the speech of Mr. Bowman, Ms. Cano, or any other person incarcerated at SCDC. JA51; *see also* JA11 (alleging that ACLU-SC only published an interview with Brittany Martin because she was moved out of SCDC and into an Illinois prison). ACLU-SC further asserts that its self-censorship was objectively reasonable given that SCDC had recently punished a prisoner and issued a public warning against a lawyer for distributing a recording of his incarcerated client's speech. JA9.

Under well-established precedent, all of ACLU-SC's planned activities are protected by the First Amendment. As a nonprofit civil rights organization, Plaintiff has a First Amendment right to interview current and prospective clients. *See In re Primus*, 436 U.S. 412, 427–28 (1978). This includes a First Amendment right to receive communications from incarcerated persons, *Martinez*, 416 U.S. at 408, to record its conversations, *PETA, Inc.*, 60 F.4th at 829, and to publish the speech of the persons it interviews, *see Near v. Minnesota*, 283 U.S. 697, 721–23 (1931); *see also Smith v. Daily Mail Publishing Co.*, 443

U.S. 97, 102 (1979) ("[S]tate action to punish the publication of truthful information seldom can satisfy constitutional standards."); *Turner v. Safley*, 482 U.S. 78, 85 (1987) ("Whatever the status of a prisoner's claim to uncensored correspondence with an outsider, it is plain that the latter's interest is grounded in the First Amendment's guarantee of freedom of speech." (quoting *Martinez*, 416 U.S. at 408)).

Based on this record, the district court correctly ruled that "Plaintiff has alleged a concrete injury because its alleged injury is based on the credible threat of enforcement in regard to its First Amendment-protected Planned Activities," JA185, and that "Plaintiff's self-censorship is an objectively reasonable response to a credible threat of enforcement [under the challenged policy]," JA186.

As this Court held in *Carolina Youth Action Project; D.S. by & through Ford v. Wilson*, 60 F.4th 770 (4th Cir. 2023) ("*CYAP*"), plausibly alleging a First Amendment injury is necessarily sufficient to trigger scrutiny. In *CYAP*, the South Carolina Attorney General argued that the "disturbing schools" and "disorderly conduct" laws challenged by the plaintiffs "do not implicate any constitutionally protected conduct." *Id.* at 782. The Court disagreed, explaining that it "already rejected" that argument by holding that the individual plaintiffs had plausibly asserted injuries to their First Amendment rights. *Id.* (citing *Kenny v. Wilson*, 885 F.3d 280, 289–90 (4th Cir. 2018) (holding that Article III injury-in-fact satisfied by showing that plaintiffs faced a "credible

20

threat of prosecution" for engaging in First Amendment expression)). So too here. Because—as the district court held—the challenged policy infringes on protected conduct, the court was "obliged to then assess whether the governmental action in question infringes that right." *Billups*, 961 F.3d at 682.

        B.    <u>The challenged policy fails First Amendment scrutiny.</u>

The four-part "reasonable relationship" test from *Turner* controls most First Amendment claims that arise in prisons. *See generally Heyer v. United States Bureau of Prisons*, 849 F.3d 202, 213 (4th Cir. 2017) (applying *Turner* to First Amendment deprivation). But when a prison policy targets *outgoing* communications—*i.e.*, information that is leaving, rather than entering, the prison—the policy must survive the more exacting standard established in *Procunier v. Martinez*, 416 U.S. 396, 413–14 (1974). *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989) (holding that *Martinez*, not *Turner*, governs outgoing communications because "[t]he implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials").

Under either test, the challenged policy fails scrutiny.

### 1. Applying the facts alleged in Plaintiff's Complaint, the challenged policy fails scrutiny under *Martinez*.

ACLU-SC alleges that the challenged policy suppresses publication of prisoner speech for the purpose of shielding crime victims from that speech, and for no other reason. JA9, JA14 ("SCDC's claimed interest—that is, protecting victims from hearing interviews with incarcerated people—is purely about the suppression of speech."). Defendant Stirling asserts other justifications for the challenged policy in his opposition to a preliminary injunction, *see* JA132–135, but those allegations are irrelevant to the Court's analysis under Fed. R. Civ. P. 12(b)(6). *See Covey*, 777 F.3d at 191–92. Because ACLU-SC plausibly asserts that the challenged policy exclusively targets speech leaving the prison (based on a perceived harm to people outside the prison), the Court must apply the more exacting test from *Martinez. See Jordan v. Pugh*, 504 F. Supp. 2d 1109, 1119–20 (D. Colo. 2007) (holding that under *Thornbugh*, restrictions on media contact for prisoners are governed by *Martinez*, not *Turner*).

To survive scrutiny under *Martinez,* Defendant Stirling must show that the challenged policy: (1) "furthers one or more of the substantial governmental interests of security, order, and rehabilitation"; (2) is "unrelated to the suppression of expression," that is, not designed "to eliminate unflattering or unwelcome opinions"; and (3) that the limitation of First Amendment freedoms is no greater than

is necessary or essential to the protection of the particular governmental interest involved. *Martinez*, 416 U.S. at 413–14. The challenged policy fails on every front.

To start, shielding crime victims from observing the speech of incarcerated people is not related to "security, order, [or] rehabilitation." *Id.* at 413. It is thus categorically insufficient under *Martinez*.

Defendant Stirling's justification also fails because it is rooted in a qualitative judgment that prisoner speech is harmful or distasteful and thus must be suppressed. This is an affront to the First Amendment. "As a Nation we have chosen . . . to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Snyder v. Phelps*, 562 U.S. 443, 461 (2011). As a result, "reactive harms"—those predicated on an emotional response to speech— "generally may *not* be used as justifications for regulation of speech." 1 Smolla & Nimmer on Freedom of Speech §§ 4.18-19 (emphasis added).

Setting aside those deficiencies, there is also no proof that the challenged policy is responsive to an "actual problem." *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 822-23 (2000) ("We agree that the Government has failed to establish a pervasive, nationwide problem justifying its nationwide daytime speech ban."). "Although prison authorities are permitted to establish regulations in anticipation of potential problems, they must at a minimum supply some evidence that

23

such potential problems are real, not imagined." *Canadian Coal.*
*Against the Death Penalty v. Ryan*, 269 F. Supp. 2d 1199, 1203 (D. Ariz.
2003) (internal quotation marks omitted). One can imagine the
*possibility* of a crime victim being offended by an incarcerated person's
speech in the media, but speech restrictions cannot rest on entirely
theoretical concerns. *Id.* at 1201–02, 1201 n.5; *see also Brown v. Ent.*
*Merchants Ass'n*, 564 U.S. 786, 799 (2011).

Finally, even if shielding crime victims from prisoner speech were
a substantial government interest, SCDC's categorical ban still fails
scrutiny because it "burdens too much and furthers too little."
*Washington Post v. McManus*, 944 F.3d 506, 523 (4th Cir. 2019). To
counsel's knowledge, the challenged policy is the most aggressive in the
nation. *See* Ajeen Ayan, *A 50 State Prison Policy Analysis on Media*
*Access* (available at: https://cdr.lib.unc.edu/downloads/kk91fr050); *see*
*also* Ellerbeck & Asher-Schapiro, *Amid nationwide strike, media access*
*to prisons is limited*, Columbia Journ. Rev. (Sept. 6, 2018). This alone
greatly undermines the policy. *See, e.g.*, *Holt v. Hobbs*, 574 U.S. 352,
368–69 (2015) ("That so many other prisons allow [the challenged
activity] . . . suggests that the Department could satisfy its security
concerns through a means less restrictive."); *Martinez*, 416 U.S. at 414
n.14 ("While not necessarily controlling, the policies followed at other
well-run institutions would be relevant to a determination of the need
for a particular type of restriction."); *McCullen v. Coakley*, 573 U.S. 464,

490 (2014) (The fact that no other state had a law as restrictive on speech as the state law at issue "raise[s] concern that the [state] has too readily forgone options that could serve its interests just as well, without substantially burdening the kind of speech in which petitioners wish to engage.").[2]

Policies in other states show that there are far less restrictive alternatives for protecting crime victims from potential discomfort. Several states enforce policies that address SCDC's concern,[3] but they achieve those interests without unduly limiting speech. *See generally* Ajeen Ayan, *A 50 State Prison Policy Analysis on Media Access* (available at: https://cdr.lib.unc.edu/downloads/kk91fr050). For

---

[2] Even accepting, for sake of argument, that some crime victims want to be shielded from prisoner speech, the challenged policy is both over- and under-inclusive relative to that purpose. To start, not all crimes have victims that need protecting. Some offenses—like drug possession and prostitution—have no victim at all. Inchoate crimes, like attempts and conspiracies, often have victims that experienced no harm. Many property crimes involve victims who, because of returned property or paid restitution, have already been made whole. Finally, many victims harbor no animosity and instead seek affirmative contact and reconciliation with their perpetrators. Given that a substantial number held at SCDC are incarcerated for victimless or quasi-victimless crimes, a policy that prevents *all* prisoners—irrespective of the existence, involvement, or attitude of the associated victim—from communicating with the press or publishing speech in the media is fatally overinclusive in its sweep.

[3] Unlike SCDC, however, other states do not treat the potential impact to crime victims as an overriding interest or as a standalone justification for their media access policies. *See generally* Ajeen Ayan, *A 50 State Prison Policy Analysis on Media Access* (available at: https://cdr.lib.unc.edu/downloads/kk91fr050). Rather, other states rely on security, administration, and order to justify their (far less onerous) restrictions on media access. *See, e.g.*, *id.* at 89 (Colorado) ("The DOC will provide for reasonable access . . . subject to the limitations necessary to maintain order and security, and promote the rehabilitative goals of the DOC."), 195 (Maine) (relying on interests in "safety, security, and orderly management").

example, some states notify victims when there is a press inquiry or interview scheduled with an incarcerated person, which allows the victims to avoid exposure to the speech if they so desire. *See id.* at 62 (Alaska), 186 (Kentucky), 198 (Maine). Rather than the tailored approach applied elsewhere, SCDC enforces an aggressive, categorical rule.

Finally, in addition to being fatally overinclusive, SCDC's own behavior reveals that the challenged policy is also unreasonably *underinclusive. See Yellowbear v. Lampert*, 741 F.3d 48, 60 (10th Cir. 2014) (Gorsuch, J.) ("A law's underinclusiveness—its failure to cover significant tracts of conduct implicating the law's animating and putatively compelling interest—can raise with it the inference that the government's claimed interest isn't actually so compelling after all."); *see also Coward v. Robinson*, 276 F. Supp. 3d 544, 571 (E.D. Va. 2017) ("As an initial matter, the means the Department is using to advance its interests in prison order and institutional security are substantially underinclusive."). Despite its professed commitment to "victims' rights," SCDC itself provides the media with recordings of conversations involving prisoners. FITSNews, for example, has trumpeted the fact that *SCDC itself* provided it with text messages, photographs, and audio recordings involving Alex Murdaugh, including his recorded jail calls with loved ones—the same incarcerated person whose published conversation with his attorney prompted punishment from SCDC.

JA70–71. Not only does FITSNews report on those materials, it also publishes the original materials for public consumption. JA71 ("[T]his week we published the latest release. That batch of materials contained three audio files – two apparent hang-ups and one connected call between Murdaugh and his surviving son, Buster Murdaugh."); *see also* FITSNews, *Alex and Buster Murdaugh's Jail Phone Call – 5/16/23*, YouTube (July 10, 2023) (available at: https://www.youtube.com/watch?v=7rwiM7rsnlc) (viewed over 43,000 times). Given that SCDC willfully shares the recorded speech of incarcerated people for publication by the news media when it serves the Department's aims, the inference is raised that "the government's claimed interest" in protecting the sensibilities of victims "isn't actually so compelling after all." *Yellowbear*, 741 F.3d at 61.

> ### 2.    Applying the facts alleged in Plaintiff's Complaint, the challenged policy also fails scrutiny under *Turner*.

Under *Turner*, the challenged policy fares no better. *Turner* requires the state to advance a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." 482 U.S. at 89 (citations omitted); *see Morrison v. Garraghty*, 239 F.3d 648, 660 (4th Cir. 2001) ("Defendants have failed, however, to demonstrate that [their policy] . . . is reasonably related to this legitimate penological interest."). If the first factor is satisfied,

courts must then weigh three additional factors: whether there are "alternative means of exercising the right that remain open to prison inmates"; "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and, finally, whether there is a "ready alternative . . . that fully accommodates the prisoner's rights at de minimis cost to valid penological interests." *Turner*, 482 U.S. at 90–91; *see also Morrison v. Hall*, 261 F.3d 896, 901, 904 (9th Cir. 2001) (holding that, under *Turner*, failure to show rational relationship between regulation and state interest is dispositive).

> (a)     The challenged policy is not entitled to deference because it fails the first *Turner* factor.

At the first step, SCDC must articulate a "legitimate penological interest" and show that the challenged policy is "reasonably related" to that interest. *Turner*, 482 U.S. at 89. Applying the facts alleged in Plaintiff's Complaint, Defendant fails both prongs.

The only legitimate penological interests identified in *Turner* are "security," "rehabilitation," and "institutional order." *See* 482 U.S. at 89, 91, 93. These interests implicate both the special expertise of prison officials and the strong reluctance of federal courts to micromanage those matters. *See Jones v. N.C. Prisoners' Lab. Union*, 433 U.S. 119, 128 (1977) ("[T]he informed discretion of prison administrators permits them, and not the courts, to make the difficult judgments concerning

institutional operations in [potentially dangerous] situations."); *Jewell v. Gonzales*, 420 F. Supp. 2d 406, 426 (W.D. Pa. 2006) ("*Turner*'s deferential standard of review is rooted in a judicial aversion to meddling in fundamental matters of prison *administration*[.]" (emphasis added)). In the dozens of cases applying *Turner*, Plaintiff is aware of no cases that have expanded the list of legitimate penological interests beyond security, order, and rehabilitation. *See, e.g.*, *Heyer*, 984 F.3d at 357 (requiring, under *Turner*, the identification of a "non-punitive" penological interest).

Here, Plaintiff has plausibly alleged that Defendant Stirling's "victims' rights" justification is the *only* interest asserted by SCDC. JA9, JA14. But protecting certain members of the public from observing speech that they may find upsetting is not a *penological* interest at all. As a result, it is not entitled to the deferential scrutiny afforded to prison officials under *Turner*. Rather, the challenged policy is rooted in an interest that is well explored and long denounced by the Supreme Court. *See, e.g.*, *Cohen v. California*, 403 U.S. 15, 21 (1971) ("The ability of government, consonant with the Constitution, to shut off discourse solely to protect others from hearing it" is only permissible "upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner."). Because the challenged policy is not grounded in a penological interest and cannot satisfy the strict scrutiny

that would otherwise apply to a reaction-based speech restriction, the policy violates the First Amendment.

But even assuming the legitimacy of the state's interest, a categorical ban on interviews and publication is not reasonably related to security, order, or rehabilitation. A policy is not rationally related if it is wildly overinclusive or underinclusive relative to the asserted interest. *See Hum. Rts. Def. Ctr. v. Sw. Va. Reg. Jail Auth.*, 396 F. Supp. 3d 607, 620 (W.D. Va. 2019) (holding that categorical ban on incoming books, though justified by a legitimate interest in "preventing fires and drug smuggling," was "not rationally related to those interests"); *cf. Pell*, 417 U.S. at 827 (security considerations, though "sufficiently paramount in the administration of the prison," "would not permit prison officials to prohibit *all* expression or communication by prison inmates." (emphasis added)). Courts have upheld restrictions on in-person interviews with incarcerated persons, noting the inherent security concerns associated with visiting a prison. *See Pell*, 417 U.S. 817; *Saxbe*, 417 U.S. 843. But here, the challenged policy goes much farther. By banning both the publication of all speech by prisoners about any topic, as well as prohibiting all forms of real-time communication—including phone and video calls, which occur at no cost to the prison, *see* JA91 ("SCDC will no incur any costs associated with inmate tablets and kiosks")—the challenged policy is revealed as not

30

rationally related (if related at all) to any legitimate penological interest.

    (b)   <u>The challenged policy also fails the remaining</u> <u>*Turner* factors.</u>

Though the Court need not reach this far, the challenged policy also fails the remaining factors of *Turner*. On the second factor, the policy fails to provide any alternative means for incarcerated people to add their voices to the public discourse—all interviews on any topic are prohibited whether in-person, by video, or by phone. JA60. And though some circuits construe constitutional interests "at a broad level of generality, leaving open the ability to easily find alternative ways of exercising the right," this Court applies *Turner*'s alternative means factor "at a fairly specific level." *Heyer*, 984 F.3d at 358 (holding that BOP restriction on point-to-point calls failed to leave open alternative means for incarcerated person to communicate with Deaf community). Under the challenged policy, there is *no* means by which incarcerated people can speak for themselves in the public discourse. Whether communicated by letter to the news media or verbally communicated to an attorney, family member, or some other individual with whom the prisoner may speak, the challenged policy requires that the incarcerated person's views be editorialized through some other third-party speaker. *See, e.g.*, JA62 ("[Incarcerated people] also are not allowed to publish their own writings in media outlets.").

31

On the third factor, SCDC's policy again fails. Unlike in cases seeking augmented visitation access, accommodating Plaintiff's demands would not "cause a significant reallocation of the prison system's financial resources [or] impair the ability of corrections officers to protect all who are inside a prison's walls." *Overton v. Bazzetta*, 539 U.S. 126, 135 (2003) (affirming prison regulation limiting number of approved visitors). Analyzed from the perspective of security, order, and rehabilitation, the interviews prohibited by the challenged policy are functionally indistinguishable from the interviews with attorneys, family members, and friends that SCDC routinely permits. Here, for example, Plaintiff does not seek additional *access* to its clients; it seeks only to be free from censorship during and after the interview. Given that these conversations are already happening between Plaintiff and its clients, permitting interviews for the purpose of publication (and not punishing Plaintiff or its clients for publishing these interviews) will have no discernible impact on officers or other prisoners.

Finally, the challenged policy also fails *Turner*'s fourth factor. As discussed above, there are many alternate means of regulating public speech by incarcerated people short of a categorical ban—indeed, *every* other prison system in the country appears to have found one.

C.      <u>The district court wrongly dismissed ACLU-SC's as-applied challenge.</u>

The district court held that although the challenged policy chilled ACLU-SC's First Amendment-protected activities, it "need not reach the issues of which level of scrutiny applies and whether the Policy passes such scrutiny, because the holdings of *Pell*, *Saxbe*, and *Houchins* . . . govern." JA191. This holding misconstrues the relief sought by ACLU-SC and misapplies the Supreme Court's legal analysis in *Pell*.

In *Pell*, litigants challenged a California prison policy that "prohibit[ed] face-to-face interviews between press representatives and individual inmates whom they specifically name and request to interview." *Pell*, 417 U.S. at 819. The policy was adopted in response to violence that arose "at least in part" because of the former policy that allowed "free face-to-face prisoner-press interviews." *Id.* at 817. Claims were brought both by incarcerated people, who argued that the policy "violate[d] their rights of free speech,"[4] and by members of the press,

---

[4] As is relevant to Plaintiff's facial challenge, *see infra*, the Court in *Pell* agreed that the challenged policy infringed on the free speech rights of incarcerated people but concluded that, "in light of the alternative channels of communication that are open to prison inmates, we cannot say *on the record in this case* that this restriction on one manner in which prisoners can communicate with persons outside of prison is unconstitutional." *Pell*, 417 U.S. at 827–28 (emphasis added). Contrary to the district court's analysis, *Pell* did not reject First Amendment scrutiny, but rather *applied* it. *See, e.g.*, *Turner*, 482 U.S. at 89–90 (citing *Pell* for the rule that prison policies must be applied "without regard to the content of expression" and must ensure that "alternative means of exercising the right remain open to prison inmates"); *see also PETA*, 60 F.4th at 827 ("*Applying* the First Amendment, of course, does not necessarily translate into invalidating a statute; it only triggers the

who argued that the policy "unconstitutionally infringe[d] the freedom of the press guaranteed by the First and Fourteenth Amendments." *Id.* at 820–21.

Importantly, "the media plaintiffs d[id] not claim any impairment of their freedom to publish . . . [i]nstead, they rel[ied] on their right to gather news without governmental interference, which [they] assert[ed] include[d] a right of access to the sources of what is regarded as newsworthy information." *Id.* at 829–30. The media plaintiffs did not allege that the challenged policy was generally too restrictive, that it lacked a legitimate penological justification, or that it failed to allow alternative methods of newsgathering. Rather, they narrowly argued that "despite the substantial access to California prisons and their inmates accorded representatives of the press," that the First Amendment guaranteed them, as members of the press, a special, concrete right to conduct "face-to-face interviews with specifically designated inmates." *Id.* at 833.

The Court rejected the reporters' claim in *Pell*. Noting that the restriction was not designed to conceal prison conditions or otherwise frustrate investigation or reporting, the Court reaffirmed that the Constitution does not afford the press "special access to information not shared by members of the public generally." *Id.* at 834.

---

balancing inquiry."). Here, the district court failed to engage in the application of First Amendment scrutiny.

Contrary to the district court's ruling below, *Pell* is legally and factually inapposite. Unlike the reporters in *Pell*, ACLU-SC does not claim that the challenged policy violates its "freedom of the press," *Pell*, 417 U.S. at 821, or that it is entitled to special "access to sources of information," *id.* at 835. And unlike in *Pell*, ACLU-SC *does* claim that the challenged policy imposes an "impairment of their freedom to publish," *id.* at 829, and *is* designed to "conceal the conditions in its prisons," *see id.* at 830. *E.g.*, JA6–7 ("By suppressing the speech of incarcerated people and Plaintiff's access to that speech, the challenged policy intentionally stifles the public's access to information on matters of deep public concern.").

The district court concluded that "the relief Plaintiff actually seeks in its Complaint is *access* to create such recordings for the purpose of later publication," JA191, but that is simply a misstatement of the Complaint. In clear terms, ACLU-SC asserts that it ***already has*** telephonic and in-person access to people incarcerated at SCDC, including its clients Mr. Bowman and Ms. Cano, but that the challenged policy restricts its First Amendment right to record and publish their speech. JA12–13. Far from alleging a special right of access, ACLU-SC asserts that the challenged policy applies to "anyone." JA6. Indeed, that is one reason ACLU-SC challenges the law both as facially overbroad and as applied to its own planned activities. *See* JA14–15 (asking to

permanently enjoin the challenged policy because it, *inter alia*, "suppresses a substantial amount of protected speech").

ACLU-SC's as-applied claim is not a "freedom of the press" or a "right of access" argument. By prohibiting ACLU-SC from publishing its incarcerated clients' speech, the policy restricts its right to *speak* on matters of importance. *See ACLU of Ill. v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012) ("The right to publish or broadcast an audio or audiovisual recording would be . . . largely ineffective, if the antecedent act of making the recording is wholly unprotected."). And because "victims' rights" is not a sufficient justification for restricting ACLU-SC's freedom of speech, the district court erred by dismissing Plaintiff's as-applied challenge.

> D.   The district court wrongly dismissed ACLU-SC's facial challenge.

The district court wrongly collapsed Plaintiff's facial challenge into its as-applied challenge. As a result, it failed to address the substantial amount of speech (other than Plaintiff's) that is prohibited and chilled by the challenged policy. Taking Plaintiff's plausible allegations as true, the challenged policy is substantially overbroad and facially violates the First Amendment.

### 1. Plaintiff's facial challenge demands separate consideration.

Plaintiff's Complaint asserts two distinct claims for relief. In its order dismissing both counts, the district court gave short shrift to ACLU-SC's claim that the challenged policy facially violates *Martinez* and *Turner* and that it is unconstitutionally overbroad—*i.e.*, that it "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep," *United States v. Hansen*, 599 U.S. 762, 769–70 (2023). *See, e.g.*, JA14; JA31, JA36. In fact, the district court resolved Plaintiff's facial challenge in a footnote, summarily concluding that it was indistinct from Plaintiff's as-applied challenge. JA191 ("[T]he holdings of *Pell*, *Saxbe*, and *Houchins* also govern Plaintiff's facial challenge."). That was error.

Even assuming that the challenged policy can be constitutionally applied to ACLU-SC's planned activities (it cannot, *see supra*), that does not resolve Plaintiff's facial challenge. The doctrine of overbreadth "instructs a court to hold a statute facially unconstitutional even though it has lawful applications, and *even at the behest of someone to whom the statute can be lawfully applied*." *Hansen*, 599 U.S. at 769 (emphasis added); *see also Sisney v. Kaemingk*, 15 F.4th 1181, 1194 (8th Cir. 2021) (considering overbreadth challenge to prison policy). To raise such a challenge, the litigant need only show that the policy causes an injury-in-fact, not that it violates their First Amendment rights. *Sisney*, 15

F.4th at 1194 ("The overbreadth doctrine allow[s] litigants whose own speech could constitutionally be regulated to challenge overly broad regulations which affect them." (citation omitted) (alterations in original)).

ACLU-SC alleges multiple injuries arising from the challenged policy. Beyond the "credible threat of enforcement in regard to its First Amendment-protected Planned Activities," JA185, ACLU-SC also alleges that the challenged policy burdens its right to receive information from willing speakers at SCDC, JA14–15. *See also* JA43–44. The district court ignored the second harm, despite Supreme Court guidance that "censorship of the communication between [a prisoner and someone else] necessarily impinges on the interest of each." *Martinez*, 416 U.S. at 408.

Given that ACLU-SC can easily clear Article III standing, it was error for the district court to skip past ACLU-SC's facial challenge and ignore the statute's unparalleled censorship of prisoners, as well as non-incarcerated press, family members, clergy, lawyers, and others who may wish to publish the speech of incarcerated people.

### 2. The challenged policy is facially overbroad in violation of the First Amendment.

To sustain an overbreadth challenge, a litigant need only show that the law "prohibits a substantial amount of protected speech relative to its plainly legitimate sweep." *Hansen*, 599 U.S. at 769–70.

38

"To judge whether a statute is overbroad, we must first determine what it covers." *Id.* Here, the sweep of the challenged policy is vast. According to SCDC, "inmates lose the privilege of speaking to the news media when they enter [prison]." JA6. To that end, the policy prohibits *all* phone calls, video calls, and in-person visits between incarcerated people and the press. Rather than simply treating the press the same as the public, as in *Pell*, the challenged policy aggressively restricts press access *because of* the First Amendment activities associated with a free press. Even interactions that are permitted—like phone calls with family, lawyers, and clergy—are regulated to ensure that those communications do not result in media publication. JA9–10. According to Defendant Stirling, the policy even prohibits the publication of letters and other written materials from incarcerated people. JA6; *see also* JA62 ("Bryan Stirling, the director of South Carolina's prison system, specified that the policy prohibits inmates from speaking to journalists in person, on the phone or through video. *They also are not allowed to publish their own writings in media outlets.*" (emphasis added)). These sweeping restrictions not only infringe on the rights of prisoners, but also (a) on the free speech rights of individuals or groups like ACLU-SC, who can communicate with prisoners but are prohibited from publishing the speech they receive, and (b) on the rights of the public to receive information about what happens behind bars. *Martinez*, 416 U.S. at 408; *see also Nolan v. Fitzpatrick*, 451 F.2d 545, 547–48 (1st Cir.

1971) ("The argument that the prisoner has the right to communicate his grievances to the press and, through the press, to the public is thus buttressed by the invisibility of prisons to the press and the public: the prisoners' right to speak is enhanced by the right of the public to hear.").

Having established the breadth of the policy, the Court must next determine which of the policy's applications are constitutional. Here, the answer is simple: virtually none. As discussed above, Plaintiff's Complaint alleges that SCDC's exclusive justification is that the policy ensures crime victims won't observe the speech of prisoners, which they might find upsetting. This reaction-based justification would never survive scrutiny outside of the prison context, *see, e.g. Cohen*, 403 U.S. at 21, and because it has nothing to do with security, rehabilitation, or prison administration, the justification fares no better under *Martinez* or *Turner*, *see supra*; *see Lumumba v. Kiser*, --- F.4th ----, 2024 WL 4097525, at *4 (4th Cir. Sept. 6, 2024) (evaluating overbreadth claim under *Turner*).

In short: the challenged policy is the most suppressive in the nation, *see* Ayan, *supra* n.3, and is justified by a hypothetical and categorically insufficient state interest. It facially violates the First Amendment under *Martinez* and *Turner* and must be struck down as overbroad.

40

## II.    The Court should grant a preliminary injunction allowing ACLU-SC to record and publish the speech of its condemned client, Marion Bowman, Jr.[5]

The district court abused its discretion by denying ACLU-SC's motion for a preliminary injunction without applying *any* First Amendment scrutiny to the challenged policy. *See Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 339 (4th Cir. 2021) ("A court abuses its discretion in denying preliminary injunctive relief when it rests its decision on a clearly erroneous finding of a material fact, or misapprehends the law with respect to underlying issues in litigation." (quoting *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 170–71 (4th Cir. 2019) (internal marks omitted)).

Rather than remanding with instructions to apply the proper legal standard, ACLU-SC asks this Court to reverse and grant the requested relief. With Mr. Bowman set to be executed on November 29, 2024, relief from this Court is the only way to avoid permanent harm to ACLU-SC's First Amendment right to record and publish the speech of Mr. Bowman in support of clemency. Because Defendant Stirling has never offered a justification for restricting that First Amendment protected conduct, the record clearly demonstrates that ACLU-SC is "likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities

---

[5] ACLU-SC makes this request without any prejudice to its right to seek additional preliminary relief in a future motion in the district court.

tips in [its] favor, and that an injunction is in the public interest."
*Winter*, 555 U.S. at 20.

> A.    <u>ACLU-SC is likely to prevail on the merits.</u>

Unless the Governor grants clemency, Marion Bowman will be
executed on November 29, 2024. To stir public support for Mr.
Bowman's forthcoming clemency petition, Plaintiff ACLU-SC seeks to
use its existing access to Mr. Bowman to record and publish an
interview. The conversation will cover his life on South Carolina's death
row, including the way he serves and supports his family and other
incarcerated people, even while incarcerated.

The First Amendment protects ACLU-SC's right to record, *see*
*PETA, Inc.*, 60 F.4th at 829, and its right to publish information that
has been lawfully obtained, *see Bartnicki*, 532 U.S. at 527–28. *See also*
*Alvarez*, 679 F.3d at 595 ("The act of *making* an audio or audiovisual
recording . . .  is necessarily included within the First Amendment's
guarantee of speech and press rights" because it flows from "the right to
disseminate the resulting recording."). Because the challenged policy
infringes these rights, the Court must "determine[] the applicable level
of scrutiny," *Billups*, 961 F.3d at 684, and decide "whether the
government's justifications for restricting the conduct or speech satisfy
the applicable standard or standards," *Pollack*, 12 F. Supp. 3d at 198.

42

As argued above, Plaintiff asserts that the challenged policy must survive scrutiny under *Martinez* because Defendant's concern is with information *leaving*, rather than *entering*, the prison. But that hardly matters here, where Defendant Stirling has not proffered a justification for censoring ACLU-SC's speech during and after its meetings with Marion Bowman that would survive *any* level of scrutiny.

### 1. The "victims' rights" justification cannot satisfy any level of scrutiny.

Shielding crime victims from potentially observing the speech of incarcerated people does not satisfy scrutiny under *Martinez* or *Turner*. *Supra* Part I.B. Protecting crime victims from an attenuated, hypothetical, and reaction-based harm is unrelated to "security, order, [or] rehabilitation." *Martinez*, 416 U.S. at 413; *Turner*, 482 U.S. at 89, 91, 93.

### 2. Stirling's generalized, *post hoc* justifications cannot justify the policy's application to ACLU-SC and Mr. Bowman.

The law "places a burden on the prison to put forward the *actual* interests that support their policies." *Firewalker-Fields v. Lee*, 58 F.4th 104, 116 (4th Cir. 2023) (emphasis added) (applying *Turner*). Explanations that were "hypothesized or invented *post hoc* in response to litigation," cannot survive constitutional scrutiny. *United States v. Virginia*, 518 U.S. 515, 533 (1996). "If it were otherwise, judicial review

of prison policies would not be meaningful." *Swift v. Lewis*, 901 F.2d 730, 732 (9th Cir. 1990) (requiring that prison officials "must at least produce some evidence that their policies are based on legitimate penological justifications"); *see also City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 758 (1988) ("Without these guideposts, *post hoc* rationalizations by the [defendant] and the use of shifting or illegitimate criteria are far too easy.").

Before this lawsuit, Defendant Stirling and SCDC repeatedly asserted that the challenged policy is "longstanding" and "rooted in victims' rights." JA60, JA62 ("'It's rooted in victims' rights,' Stirling said."). After being sued, though, Stirling started arguing that his (and SCDC's) previous representations "have little relevance to the reasons underlying the . . . policy," because "the regulation in question has been in effect for decades—long before [he] assumed his current post." JA120. Rather than defending the policy based on an interest in "victims' rights," Stirling pivoted to ten generalized prison interests listed in an affidavit from SCDC employee Bryan Antonelli. JA120–121. These justifications fail for three reasons.

> (a)     After-the-fact explanations cannot survive constitutional scrutiny.

To start, the circumstances strongly suggest that the interests invoked by Defendant Stirling were developed solely to defend against this lawsuit. Neither the written policy nor SCDC's public statements

44

about the challenged policy ever mention a justification beyond protecting crime victims from potentially upsetting speech. As the Sixth Circuit has wisely warned, "explanations offered for the first time in litigation ought to come with a truth-in-litigating label, requiring the official to disclose whether the new explanations motivated the prison officials at the time of decision or whether they amount to post hoc rationalizations." *Haight v. Thompson*, 763 F.3d 554, 562 (6th Cir. 2014) (citing *Shaw v. Hunt,* 517 U.S. 899, 908 n. 4 (1996) ("To be a compelling interest, the State must show that the alleged objective was the ... 'actual purpose' for the [government's action].")).

To pass First Amendment scrutiny, the government's asserted interests must be "genuine and not merely post-hoc rationalizations." *Cornelio v. Conn.*, 32 F.4th 160, 173 n.5 (2d Cir. 2022). Without such proof here, the interests discussed in the Antonelli affidavit fail scrutiny.

> (b)    <u>Stirling does not assert—much less prove—that his new interests were the actual interests that supported the policy.</u>

Even without the suspicious circumstances, the Antonelli justifications still fail. "Defendants cannot merely brandish the words 'security' and 'safety' and expect that their actions will automatically be deemed constitutionally permissible conduct." *Campos*, 854 F. Supp. at 207. The Antonelli affidavit never explains the actual bases of the

challenged policy—it merely recites ten "adverse consequences" that, "based on [Antonelli's] experience," can potentially arise from any "communication between inmates and the general public." JA133–134. Mr. Antonelli only started as an employee of SCDC in 2023, makes no claims about the origin of the policy or its initial justifications, and offers no evidence that the policy is or was ever rooted in an "actual problem." *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 822–23 (2000). Rather, he merely asserts that, in his experience, "*elimination* of the policy" would produce a host of "adverse consequences." JA133–135 (emphasis added).

When prisons fail to assert the actual justification for their policies, they lose. In *Swift*, 901 F.2d at 731–32, for example, the Ninth Circuit held that a prison grooming policy failed scrutiny under *Turner* where defendants "failed to provide any evidence that the interests they have asserted are the actual bases for their grooming policy." Likewise, in *Quinn v. Nix*, 983 F.2d 115, 118 (8th Cir. 1993), the Eighth Circuit held that a prison's restrictions on hairstyles could not be justified by an interest in curtailing gang activity because defendants failed to prove that was the actual motivation for the restrictions. *Id.* ("Prison officials are not entitled to the deference described in *Turner* . . . if their actions are not actually motivated by legitimate penological interests *at the time they act*." (emphasis added)).

46

As this Court has explained, when a defendant "fail[s] to advance any penological, or other, justification," for a challenged prison policy, "[t]he defendant's silence on the matter" shows that the conduct sought by the prisoner is "constitutionally mandated." *Ali v. Dixon*, 912 F.2d 86, 90 (4th Cir. 1990). That is the case here. Regarding Plaintiff's request for preliminary relief, Defendant Stirling is bound by his decision not to "put forward the *actual* interests that support [his] policies." *Firewalker-Fields*, 58 F.4th at 116. Because an interest not asserted cannot survive scrutiny, ACLU-SC is likely to prevail on the merits of its First Amendment claim regarding its publication of an interview with Marion Bowman.

      (c)    Even if considered, the new generalized concerns do not justify restricting ACLU-SC's planned activities with Mr. Bowman.

Mr. Antonelli asserts that any "communication between inmates and the general public" can cause the following problems:

    a.  Disruption to the orderly operation of prisons;

    b.  Drain on prison staffing;

    c.  Security risk due coded messages to criminal associates;

    d.  Risk of institutional violence should a rival group or gang take offense to statements;

    e.  Potential for encouraging violence through incendiary speech;

47

    f.   Lack of sensitivity for any outside crime victims;

    g.   Potential exposure of sensitive information on internal and external procedures and planned activities;

    h.   Risk of impact on other ongoing litigation;

    i.   Detrimental impact on rehabilitation efforts; and

    j.   Potential for an inmate to develop celebrity status that contributes to management and control problems within the inmate population.

JA133–134.

But neither Mr. Antonelli nor Defendant Stirling explain why these "adverse consequences" justify the sweeping prohibitions that are enforced by SCDC. For example, Mr. Antonelli touts his 25 years of employment at the Federal Bureau of Prisons but fails to explain why SCDC—unlike every other prison system, including his previous employer—prohibits all personal interviews. *See, e.g.*, 28 C.F.R. § 540.63 (allowing scheduled, recorded, and unsupervised interviews between prisoners and members of the news media).

Defendant Stirling and Mr. Antonelli also fail to explain how any of these generalized interests are implicated by ACLU-SC's planned activities with Marion Bowman. SCDC already permits ACLU-SC to meet with Mr. Bowman in person and by phone—thus, the prohibited activities (recording and publishing) do not require additional support from prison staff. *See* (a), (b). Mr. Bowman has no criminal associates,

*see* (c), is not gang involved, *see* (d), and a plea for clemency is not likely
to incite violence, *see* (e), or reveal security-related information about
the prison, *see* (g). The First Amendment does not permit the
government to suppress important political speech merely because
others might find it upsetting, *see* (f), and as Stirling knows, there is no
ongoing litigation that would be impacted by ACLU-SC's planned
activities, *see* (h). Finally, any "celebrity status" Mr. Bowman
develops—if any—will not arise from the publication of his speech *per
se*, but from Defendant Stirling's plan to kill, rather than rehabilitate, a
South Carolina citizen. *See* (i), (j).

When challenging a prison regulation, the plaintiff carries the
burden of persuasion. That said, "Defendants are required to at least
articulate a rationale in support of the disputed polices such that the
Court can perform a meaningful review of the challenged policy under
*Turner*." *Prison Legal News v. Stolle*, 319 F. Supp. 3d 830, 836 (E.D. Va.
2015). Prison officials may not "pil[e] conjecture upon conjecture," *Reed
v. Faulkner*, 842 F.2d 960, 963 (7th Cir. 2001), and "cannot avoid court
scrutiny [under *Turner*] by reflexive, rote assertions," *Armstrong v.
Davis*, 275 F.3d 849, 874 (9th Cir. 2001) (quoting *Shimer v. Washington*,
100 F.3d 506, 510 (7th Cir. 1996)). Here, it is not the Court's job to
speculate as to how any of these rights *might be* implicated by a
recorded interview in support of Mr. Bowman's bid for clemency. *Cf.
Miller-El v. Cockrell*, 537 U.S. 322, 324 (2003) ("[D]eference does not

imply abandonment or abdication of judicial review."). Because Defendant Stirling has failed to justify the policy's application to ACLU-SC's planned activities with Mr. Bowman, ACLU-SC is likely to prevail on the merits.

### B. Plaintiffs established they are likely to suffer irreparable harm absent preliminary relief.

"The loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). That is undoubtedly true in this circuit, where First Amendment violations are treated as "per se irreparable injur[ies]." *Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir. 1978); *see also In re Murphy-Brown, LLC*, 907 F.3d 788, 796 (4th Cir. 2018).

Beyond that, the imminent execution of Mr. Bowman further sharpens the need for immediate relief. Unless a preliminary injunction is granted soon, ACLU-SC's First Amendment right to record and publish in support of Mr. Bowman's clemency petition will be permanently and irreparably harmed.

### C. Plaintiffs established both that the balance of equities and the public interest favor preliminary injunctive relief.

Because Plaintiff demonstrated likelihood of success on its First Amendment claims, *see supra*, the remaining *Winter* factors follow suit. As several circuits have explained, "in the First Amendment context, . . . the likelihood of success on the merits is the dominant, if not the

50

dispositive, factor." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013); *see also Joelner v. Vill. of Wash. Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004); *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998)).

"In cases involving significant public interest, courts may consider the balance of the equities and the public interest factors together." *Thomas v. Andino*, 613 F. Supp. 3d 926, 954 (D.S.C. 2020) (cleaned up). This Court has held that these "factors [are] established when there is a likely First Amendment violation," as is the case here. *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 191 (4th Cir. 2013).

Defendant Stirling is "in no way harmed by issuance of a preliminary injunction which prevents [SCDC] from enforcing restrictions likely to be found unconstitutional." *Id.* (quoting *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)); *see also Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021). Instead, "[t]he balance of equities . . . generally favors the constitutionally-protected freedom of expression." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds by Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012). Furthermore, it is well established that the public interest favors protecting constitutional rights, such as the First Amendment rights at issue here. *See Giovani Carandola, Ltd.*, 303 F.3d at 521. That is

especially true here, where the public deserves to receive information from and about Marion Bowman *before* he is killed by the state.

## CONCLUSION

The district court erred by denying preliminary injunctive relief and dismissing the case without applying any First Amendment scrutiny. Because the challenged policy is unconstitutional on its face and as applied to ACLU-SC's plan to record and publish an interview with Marion Bowman, the district court's order of dismissal should be **vacated** as to both counts and a preliminary injunction should be **granted** as it relates to ACLU-SC's planned activities with Marion Bowman.

Dated:  October 4, 2024

Respectfully submitted,


**ACLU OF SOUTH CAROLINA**

*/s Allen Chaney*
_____
Allen Chaney
Fed. Id. 13181
P.O. Box 1668
Columbia, SC 29202
Tel: (843) 282-7953
achaney@aclusc.org

**AMERICAN CIVIL LIBERTIES**
**UNION FOUNDATION**

Emerson J. Sykes
ACLU Speech, Privacy, and
Technology Project
125 Broad Street, 18th Floor
New York, NY 11230
Tel: (212) 549-2500
esykes@aclu.org/

David C. Fathi*
ACLU National Prison Project
915 15th Street NW, 7th Floor
Washington, DC 20005
Tel: (202) 393-4930
dfathi@aclu.org

Corene T. Kendrick
ACLU National Prison Project
425 California St., Ste 700
San Francisco, CA 94104
Tel: (202) 393-4930
ckendrick@aclu.org

Attorneys for Plaintiff-Appellant

* Not admitted in D.C., practice limited to federal courts.