No. 24-1882

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF SOUTH CAROLINA,

*Plaintiff-Appellant,*

v.

BRYAN STIRLING, in his official capacity as director of the South Carolina
Department of Corrections,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of South Carolina
No. 3:24-cv-00906-JDA
Hon. Jacqueline D. Austin

———————————————————

**RESPONSE BRIEF OF APPELLEE**

———————————————————

WOMBLE BOND DICKINSON (US) LLP

Kevin A. Hall                          David Collins
Kevin.Hall@wbd-us.com                  David.Collins@wbd-us.com
M. Todd Carroll                        5 Exchange Street
Todd.Carroll@wbd-us.com                Charleston, SC  29401
1221 Main Street, Suite 1600
Columbia, SC  29201

*Counsel for Defendant-Appellee*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Fourth Circuit Local Appellate Rule 26.1, Defendant-Appellee states that it is not a publicly held corporation, other publicly held entity, or trade association; that it does not issue shares to the public and has no parent companies, subsidiaries, or affiliates that have issued shares to the public in the United States or abroad; that no publicly held corporation or other publicly held entity has a direct financial interest in the outcome of the litigation; and that the case does not arise out of a bankruptcy proceeding.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ..........................................i

TABLE OF CONTENTS.............................................................. ii

TABLE OF AUTHORITIES ...................................................... iii

INTRODUCTION ...................................................................1

JURISDICTIONAL STATEMENT ...............................................6

STATEMENT OF ISSUES ........................................................7

STATEMENT OF THE CASE .....................................................8

STANDARD OF REVIEW .........................................................9

SUMMARY OF ARGUMENT ....................................................10

ARGUMENT .........................................................................12

   **I.**    Appellant Fails to State a Plausible Argument that its Claimed First Amendment Right to Publish Legitimately Obtained Inmate Speech Are Impaired by SCDC Policy. .........................................................12

   **II.**   Appellant Fails to State a Plausible Argument that its Claimed First Amendment Newsgathering Rights Are Impermissibly Infringed Upon by the SCDC Policy Restricting Access to Inmates for Personal Contact Interviews. ....................................................................13

      **A.**   Binding Supreme Court Precedent Is Dispositive of Plaintiff's Claims.13

      **B.**   The ACLU's Attempts to Distinguish Precedent Are Unavailing..........18

   **III.**  The Appellee's Policies Should Not Be Subject to Strict Scrutiny ...........26

   **IV.**  Separate Analysis of SCDC Policy In Relation To An Individual Inmate Is Inappropriate..............................................................29

CONCLUSION .......................................................................33

# TABLE OF AUTHORITIES

**Cases**

*Bell v. Wolfish*,
    441 U.S. 520 (1979)............................................................................3

*Branzburg v. Hayes*,
    408 U.S. 665 (1972)..........................................................................13

*Clark v. Cmty. for Creative Non–Violence*,
    468 U.S. 288 (1984)..........................................................................12

*Cooper v. Smithfield Packing Co.*,
    724 Fed. Appx. 197 (4th Cir. 2018) .................................................9

*Di Biase v. SPX Corp.*,
    872 F.3d 224 (4th Cir. 2017) ..........................................................33

*Direx Israel, Ltd. v. Breakthrough Med. Corp.*,
    952 F.2d 802 (4th Cir. 1991) ..........................................................31

*Goldie's Bookstore v. Super. Ct. of State of California*,
    739 F.2d 466 (CA9 1984)..................................................................9

*Henderson ex rel. NLRB v. Bluefield Hosp. Co., LLC*,
    902 F.3d 432 (4th Cir. 2018) ..........................................................31

*Houchins v. KQED, Inc.*,
    438 U.S. 1 (1978)............................................. 15, 17, 18, 19, 21, 26, 27

*Int'l Bhd. of Teamsters v. Airgas, Inc.*,
    239 F. Supp. 3d 906 (D. Md. 2017)................................................32

*Jones v. North Carolina Prisoners' Union*, 433 U.S. 119 (1977) ...........................11

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
    979 F.3d 219 (4th Cir. 2020), rev'd on other grounds, 2 F.4th 330 (4th
    Cir. 2021) ........................................................................................31

*Pashby v. Delia*,
    709 F.3d 307 (4th Cir. 2013) ..........................................................31

*Pell v. Procunier*,
    417 U.S. 817 (1974)............... 4, 13, 14, 15, 16, 17, 18, 19, 20, 23, 25, 26, 27

*Procunier v. Martinez*,
    416 U.S., at 413 ....................................................... 22, 26, 27, 28

*Quince Orchard Valley Citizens Ass'n v. Hodel*,
    872 F.2d 75 (4th Cir. 1989) ............................................................9

*Real Truth About Obama, Inc. v. Fed. Election Comm'n*,
    575 F.3d 342 (4th Cir. 2009) ......................................................31

*Reno v. ACLU*,
    521 U.S. 844 (1997)...................................................................32

*Roswell v. Mayor*,
    671 F. Supp. 3d 607 (D.Md. 2023), aff'd 2023 U.S. App. LEXIS
    33595 (4th Cir. December 19, 2023).........................................31

*Saxbe v. Wash. Post Co.*,
    417 U.S. 843 (1974)................... 14, 15, 16, 18, 19, 20, 22, 23, 25, 26, 27, 29

*SEC v. Carter Hawley Hale Stores, Inc.*,
    760 F.2d 945 (CA9 1985)............................................................9

*Thornburgh v. Abbott*, 490 U.S. at 412....................................... 25, 27, 28

*Turner v. Safley*,
    482 U.S. 78 (1987)............................................... 3, 5, 11, 25, 26, 27

*United States v. Playboy Entm't Group*,
    529 U.S. 803 (2000)...................................................................32

*Wetzel v. Edwards*,
    635 F.2d 283 (CA4 1980)............................................................9

*White House Vigil for ERA Committee v. Watt*,
    230 U.S. App. D.C. 291, 717 F.2d 568 (CADC 1983) ..................9

*Winter v. NRDC, Inc.*,
    555 U.S. 7 (2008)........................................................... 11, 30, 31

*Zemel v. Rusk*,
    381 U.S. 1 (1965)......................................................................13

## **Rules**

Federal Rule of Civil Procedure 12(b)(1) ...............................................32

Federal Rule of Civil Procedure 12(b)(6) .................................................9

# INTRODUCTION

The American Civil Liberties Union Foundation of South Carolina ("Appellant" or "ACLU") challenges an alleged restriction on its newsgathering activities stemming from South Carolina Department of Corrections ("SCDC" or "Appellee") Policy/Procedure GA-02.1-8.  In place since 2000, this policy provides that:

> REQUESTS FOR INTERVIEWS WITH INMATES: Personal contact interviews with any SCDC inmate, untried county safekeeper, or death row inmate by anyone will be prohibited. (NOTE: This prohibition does not apply to internal or external law enforcement, Agency officials, internal and external auditors, or legal professionals who may need to interview inmates for purposes of an investigation or pending legal action or to researchers approved pursuant to SCDC Policy/Procedure ADM-15.07, "Research Conducted Within the SCDC.")

JA058. SCDC has interpreted "personal contact" to include interviews by telephone.

This Policy is included in chapter GA-02.01 of the SCDC's procedures which is entitled "Employee and Inmate Relations with News Media, Legislators, and Others."  JA054-059.  This chapter sets forth several limitations on the public's access to the prison system, its inmates, and employees.  These procedures make multiple references to the protection of the integrity and security of the SCDC institutions.  *See*, *e.g.*, GA-02.01.2.2 ("Any information provided to any news or non-news media representative will be limited to that which would not…jeopardize the integrity of the institution/Agency") (JA055); GA-02.01.4.4 ("News media

1

representatives will be expected to abide by all security safeguards, rules, regulations, and conditions of any prearranged and approved visit") (JA056); GA-02.1.4.6 ("The Agency Director's Office or an approved designee reserves the privilege to cancel any scheduled tour/visit as a result of legitimate concerns for safety and security") (JA057); and GA-02.1.6.2 ("The Agency reserves the privilege to suspend, cancel, or disapprove any request to tour or visit any SCDC institution or building, or to interview any employee at any time based on legitimate concerns related to the safety and security of the Agency, employees, and inmates, or based on an individual's failure to abide by the conditions, rules, and regulations of any prearranged visit, tour, or interview") (JA057).  Thus, it is clear from the actual language of the SCDC restrictions on public and media access that penological concerns are, and always have been, at the heart of their purpose and intent.

The ACLU further contends without support that:

> The breadth of the challenged policy is unparalleled. Unique among prison systems nationwide, SCDC takes the categorical position that "[i]nmates lose the privilege of speaking to the news media when they enter SCDC."

Appellant's Br. 1.

This position is belied by the materials submitted in support of the ACLU's request for relief.  For example, one article attached to its initial Memorandum of Law states that:

2

> state and federal authorities are free to ban interviews between reporters and inmates, partially on the grounds of security. State policies on media access vary widely, with some states limiting interviews to 15 to 20 minutes and other states banning face-to-face interviews…. In practice, states have repeatedly curtailed speech and access for purposes of security.

JA086.[1]

Thus, significant security related limitations on access to inmates for purposes of media interviews in the American penal community is the rule rather than the exception.[2]

Also implicit in the prohibition on personal contact interviews is the preclusion of the recording of such interviews by any means. In addition, other policies in chapter GA-02.1 prohibit audio and visual recording of specific inmates. *See*, *e.g.*, GA-02.1.4.5 ("News media representatives will be prohibited from taking photographs and/or audio/video recordings of inmates that may identify the inmate at any time") (JA056); and GA-02.6.4 ("News and non-news media representatives

---

[1]    In its Brief, the Appellant repeatedly references a paper by a college student (with an admitted bias against existing Supreme Court precedent) to support the relative strictness of the South Carolina policy. *See* Appellant's Br. 24, 25, and 25 n.3. It did not, however, include this thesis in the Joint Appendix. Even if this survey is properly before the Court, the Plaintiff overstates its conclusion. For example, the writer states that North Dakota does not permit media interviews with specific individual inmates.

[2]    Even if the opposite were true, the U.S. Supreme Court has held that "[a]s our previous decisions make clear, however, the Constitution 'does not mandate a "lowest common denominator" security standard, whereby a practice permitted at one penal institution must be permitted at all institutions.'" *Turner v. Safley*, 482 U.S. 78, 95 (1987), quoting in part *Bell v. Wolfish*, 441 U.S. 520, 554 (1979).

will be prohibited from taking identifiable photographs and/or audio/video recordings of any inmate(s)") (JA057). Accordingly, this restriction on methods of inmate access is consistent with the SCDC's overall policy.

Furthermore, nothing in the relevant Policy (or in chapter GA-02.1 in general) prohibits the publication of prisoner speech legitimately obtained via written correspondence with the inmate. While the ACLU nevertheless alleges that the publication of such correspondence would categorically violate SCDC policy, SCDC repeatedly demonstrated to the lower court that such publication was permissible. JA101, JA122-123, JA129-130, JA155 and JA172. Accordingly, any complaints regarding the SCDC's policies relate to the unavailability of access to "sources of information not available to members of the public generally," *Pell v. Procunier*, 417 U.S. 817, 834-35 (1974), rather than to any ban on legitimately obtained speech.

Finally, the Appellant argues for the first time that SCDC is required to justify the application of its general policy to a single "planned activity", *i.e.,* a multimedia broadcast of a recorded interview with inmate Marion Bowman. Since binding Supreme Court precedent demonstrates the propriety of the SCDC policy as matter of law, it is unnecessary to reexamine this limitation in the context of one "client" of the Appellant. Otherwise, it would:

> distort the decisionmaking process, for every administrative judgment would be subject to the possibility that some court

4

somewhere would conclude that it had a less restrictive way of solving the problem at hand. Courts inevitably would become the primary arbiters of what constitutes the best solution to every administrative problem, thereby "unnecessarily perpetuat[ing] the involvement of the federal courts in affairs of prison administration."

*Turner*, 482 U.S. at 22-23 (citations omitted).

Consequently, such individualized analysis is unnecessary and improperly conflates the Appellant's interests with those of a non-party inmate.[3]

---

[3]    Although the SCDC disagrees with the lower court's finding of constitutional standing, it has opted not to pursue a cross-appeal. Since this issue implicates subject matter jurisdiction, however, this Court is free to consider the question *sua sponte*. If it is inclined to do so, the Defendant would crave reference to its arguments presented below. JA104-112; JA153-158; and JA171-172.

## JURISDICTIONAL STATEMENT

The Appellee SCDC is satisfied with the Appellant ACLU's jurisdictional statement.

## STATEMENT OF ISSUES

I.     Did the lower court properly rule that the prohibition of access to inmates for purposes of personal contact interviews was constitutionally permissible under binding Supreme Court precedent?

II.    Given the constitutional permissibility of the blanket prohibition of access for personal contact interviews, did the court below err in failing to scrutinize the application of this policy in the instance of a single one of the Appellant's clients?

III.   Did the District Court abuse its discretion in finding that the Appellant did not clearly establish its entitlement to injunctive relief?

## STATEMENT OF THE CASE

The Appellee SCDC agrees with the basics of the procedural history recited by Appellant ACLU.

The facts relevant to the issues submitted for review are summarized in the Introduction hereto.  In short, the Appellee SCDC submits that the case was properly dismissed by the court below as SCDC's blanket policy prohibiting access for purpose of personal contact interviews is permissible under binding Supreme Court precedent.

## STANDARD OF REVIEW

"A district court properly dismisses a claim under Federal Rule of Civil Procedure 12(b)(6) when the complaint does not include sufficient factual allegations to render the claim facially plausible, or to permit reasonable inference that the defendant is liable for the alleged misconduct." *Cooper v. Smithfield Packing Co.*, 724 Fed. Appx. 197, 200 (4th Cir. 2018). "On appeal, this Court reviews the district court's conclusions of law regarding dismissal…*de novo*." *Id.*

As to the denial of a request for a preliminary injunction, this Court has held that:

> The decision to issue or deny a preliminary injunction is committed to the sound discretion of the trial court. That decision will not be disturbed on appeal unless the record shows an abuse of that discretion, regardless of whether the appellate court would, in the first instance, have decided the matter differently. *See Wetzel v. Edwards*, 635 F.2d 283 (CA4 1980). A district court abuses its discretion "by applying an incorrect preliminary injunction standard, by resting its decision on a clearly erroneous finding of a material fact, or by misapprehending the law with respect to underlying issues in litigation." *Goldie's Bookstore v. Super. Ct. of State of California*, 739 F.2d 466, 470 (CA9 1984). *See also SEC v. Carter Hawley Hale Stores, Inc.*, 760 F.2d 945 (CA9 1985); and *White House Vigil for ERA Committee v. Watt*, 230 U.S. App. D.C. 291, 717 F.2d 568 (CADC 1983).

*Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 78 (4th Cir. 1989).

## SUMMARY OF ARGUMENT

I.    Although the ACLU claims that SCDC prohibits the publication of correspondence from an inmate, these allegations are not true.  The SCDC regulations introduced into the record make no mention of any such restriction.  Most importantly, SCDC has affirmed in its filings that inmate speech obtained by permissible means can be published.  Thus, no viable First Amendment infringement concerning publication exists.

II.   Decades of Supreme Court precedent establish that blanket restrictions on access to prisoners is justified by legitimate, well-documented penological concerns.  The record created by the ACLU also demonstrates that SCDC's regulation of contact between inmates and the public, including the media, are rationally related to valid governmental interests.  In addition, the ACLU's alternative avenue for newsgathering through written correspondence is both available and constitutionally sufficient under binding caselaw.

III.  It is unnecessary to employ a selective policy which balances penological concerns against First Amendment rights on a case-by-case basis in relation to access.  Rather, this delicate balancing is more appropriately left to the prison authorities.  As opined by the Supreme Court:

> "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform."… Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of

10

which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have…additional reason to accord deference to the appropriate prison authorities.

*Turner v. Safley*, 482 U.S. 78, 84-85 (1987). Thus, "appropriate deference to the decisions of prison administrators and appropriate recognition [of] the peculiar and restrictive circumstances of penal confinement," *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 125 (1977), demonstrate that the challenged policy passes constitutional muster.

IV.    The ACLU's demand for a preliminary injunction must fail due to the unlikelihood of success on the merits. *See Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). Since the issue of access to inmate Bowman does not involve content-based restrictions, the lenient standard suggested by the ACLU is inappropriate.

11

**ARGUMENT**

**I.    Appellant Fails to State a Plausible Argument that its Claimed First Amendment Right to Publish Legitimately Obtained Inmate Speech Are Impaired by SCDC Policy.**

The ACLU concedes that SCDC policy allows it to conduct written correspondence with inmates but claims that it is barred from publishing the content of this correspondence.  Appellant's Br. 1.  However, nothing in the policy relating to personal contact interviews or in the other policies relating to inmate relations with the media and the general public (JA054-059) mentions any such prohibition.  Furthermore, SCDC repeatedly demonstrated to the lower court that such publication was permissible.  JA101, JA122-123, JA129-130, JA155 and JA172.  Accordingly, it would be judicially estopped from taking a contrary position.

As noted in the ACLU's brief:

> the plaintiff bears an initial burden to "demonstrate that the First Amendment even applies." *Clark v. Cmty. for Creative Non–Violence*, 468 U.S. 288, 293 n.5 (1984). If it does not, the court "need go no further." *Cornelius*, 473 U.S. at 797.

Appellant's Br. 16.

Here, the ACLU is free to publish inmate speech received in written correspondence.  As a consequence, there is no infringement of any First Amendment right and this Court "need go no further" regarding this issue.

12

II.    **Appellant Fails to State a Plausible Argument that its Claimed First Amendment Newsgathering Rights Are Impermissibly Infringed Upon by the SCDC Policy Restricting Access to Inmates for Personal Contact Interviews.**

A.    Binding Supreme Court Precedent Is Dispositive of Plaintiff's Claims

Since SCDC is not restraining the publication of direct inmate speech obtained through legitimate means - *i.e.,* written correspondence - the ACLU must show that SCDC's policy violates the First Amendment protections applicable to its "newsgathering" activities. *See Branzburg v. Hayes*, 408 U.S. 665, 707 (1972). In this context, it is true that "the First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability." *Id.* at 682. Importantly, however, "[t]he right to speak and publish does not carry with it the unrestrained right to gather information." *Zemel v. Rusk*, 381 U.S. 1, 17 (1965) (noting that "[t]here are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow."). Accordingly, "[i]t has generally been held that the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." *Branzburg*, 408 U.S. at 684.

As conceded by the ACLU, these principles have led the Supreme Court to uphold the "discretion of prison officials to approve or deny physical entry into facility". JA036, citing *Pell v. Procunier*, 417 U.S. 817 (1974). The *Pell* decision, however, goes much farther than suggested by the Appellant's bland parenthetical.

13

In *Pell*, the Supreme Court addressed a constitutional challenge to a California Department of Corrections policy that prohibited media interviews with inmates designated by media representatives. The policy at issue provided that "press and other media interviews with specific individual inmates will not be permitted".[4] *Id.* at 819. After being denied access to three specific inmates for purposes of an interview, three reporters challenged this regulation. *See id.* at 820. These media plaintiffs asserted that "face-to-face interviews with specifically designated inmates is such an effective and superior method of newsgathering that its curtailment amounts to unconstitutional state interference with a free press." *Id.* at 833. The Court expressly rejected this proposition holding that "newsmen have no constitutional right of access to prisons or their inmates beyond that afforded the general public." *Id.* at 834.

In *Saxbe v. Wash. Post Co.*, 417 U.S. 843 (1974), a companion case to *Pell*, "a major metropolitan newspaper and one of its reporters…challenge[d] the constitutionality of…the Federal Bureau of Prisons… regulation [which] prohibited any personal interviews between newsmen and individually designated federal prison inmates."[5] *Id.* at 844. Although the lower courts attempted to balance the

---

[4]   Obviously, the California regulation would have prohibited the specific planned activities identified by the ACLUE here, *i.e.*, interviews with inmates Cano and Bowman.

[5] Again, this federal policy would have banned the specific planned activities advanced by the ACLU in the instant case.

First Amendment interests of the press with the penological interests advanced by

the policy, the Supreme Court held that such a balancing test was unnecessary and

inappropriate.  According to the Court:

> it is unnecessary to engage in any delicate balancing of such
> penal considerations against the legitimate demands of the
> First Amendment. For it is apparent that the sole limitation
> imposed on newsgathering by Policy Statement 1220.1A is
> no more than a particularized application of the general rule
> that nobody may enter the prison and designate an inmate
> whom he would like to visit, unless the prospective visitor is
> a lawyer, clergyman, relative, or friend of that inmate.

*Id.* at 849.

Since the "policy [did] not place the press in any less advantageous position

than the public generally … [the case was] constitutionally indistinguishable from

*Pell v. Procunier*…and thus fully controlled by the holding in that case."  *Id.* at 849-

850 (internal citations omitted).  Accordingly, the Supreme Court extended its

holding in *Pell* to conclude that "[t]he proposition 'that the Constitution imposes

upon government the affirmative duty to make available to journalists sources of

information not available to members of the public generally . . . finds no support in

the words of the Constitution or in any decision of this Court.'"  *Id.* at 850, quoting

in part *Pell*, 417 U.S. at 834-835.

The Supreme Court reiterated and affirmed its decisions in *Pell* and *Saxbe* in

a third case addressing media rights in the prison context.  In *Houchins v. KQED,*

*Inc.*, 438 U.S. 1 (1978), the Court further established that the restrictions on access

15

countenanced by *Pell* and *Saxbe* extended to interview methodology. The media Plaintiffs in *Houchins* claimed that the First Amendment protected their right to "interview inmates and make sound recordings, films, and photographs for publication and broadcasting by newspapers, radio, and television." *Id.* at 3. "They further asserted that television coverage of the conditions in the cells and facilities was the *most effective way* of informing the public of prison conditions." *Id.* at 4 (emphasis added). In declining to accept this contention, the Court observed that the media was able to learn about jail conditions in a variety of ways other than by recorded interviews with inmates:

> [Media] [r]espondents have a First Amendment right to receive letters from inmates criticizing jail officials and reporting on conditions. Respondents are free to interview those who render the legal assistance to which inmates are entitled. They are also free to seek out former inmates, visitors to the prison, public officials, and institutional personnel, as they sought out the complaining psychiatrist here.

*Id.* at 15 (citations omitted). The Court concluded that:

> Neither the First Amendment nor the Fourteenth Amendment mandates a right of access to government information or sources of information within the government's control. Under our holdings in *Pell v. Procunier, supra,* and *Saxbe v. Washington Post Co., supra,* until the political branches decree otherwise, as they are free to do, the media have no special right of access to the Alameda County Jail different from or greater than that accorded the public generally.

*Id.* at 15-16.

In the instant case and similar to the media plaintiffs in *Pell* and *Houchins*, the ACLU complains that SCDC policy precludes its preferred method for news gathering. JA030 ("A story *about* Marion Bowman…is not equivalent to a story *by* Marion Bowman.") (emphasis in original). In other words, the ACLU insists that written communications from an inmate are a constitutionally inadequate substitute for audio or video recordings of the same prisoner. This argument is no different from the assertion in *Pell* that "face-to-face interviews with specifically designated inmates" were required by the First Amendment even though "the medium of written correspondence afford[ed] inmates an open and substantially unimpeded channel for communication with persons outside the prison, including representatives of the news media" and "inmates [had] an unrestricted opportunity to communicate with the press or any other member of the public through their families, friends, clergy, or attorneys who are permitted to visit them at the prison". *Pell*, 417 U.S. at 824-25. Furthermore, *Houchins* specifically rejected the proposition that restrictions on recordings were significant from a constitutional perspective. Since the same "alternative avenues of communication" discussed in *Pell* and *Houchins* are available to the ACLU in the instant case, there is no impermissible restriction on its newsgathering as a matter of law.

As stressed by the ACLU, the regulation at issue applies to "anyone". Appellant's Br. 1 (The challenged policy "is also enforced against anyone—not just

members of the press—who seeks to publicly disseminate prisoner speech, including family, friends, and attorneys."). Accordingly, the general public does not enjoy a means of access to inmates that is superior to that permitted for journalists or advocacy groups. In other words, the policy does not put the Plaintiff "in any less advantageous position than the public generally". Therefore, as held below, *Pell*, *Saxbe* and *Houchins* mandate the dismissal of the ACLU's claims.

B.     The ACLU's Attempts to Distinguish Precedent Are Unavailing

The ACLU seeks to avoid the obvious implications of the trilogy of *Pell*, *Saxbe,* and *Houchins* by insisting that it is not requesting "access" to inmates. First, it claims that it already has "access" to inmates and that it "seeks relief from SCDC's suppression of its First Amendment expressive activities during and after its client meetings." Appellant's Br. 18-19 and JA42. This argument was rejected by the District Court which correctly observed that:

> the access Plaintiff already has is a red herring here because mere access to meet with its clients and discuss their legal cases is not what Plaintiff seeks in this case. Rather, it is apparent from the Complaint that what Plaintiff seeks is a different type of access: access to SCDC inmates, including its clients, for the purpose of recording interviews for publishing.

JA190.

As noted above, SCDC's restrictions on personal contact interviews expressly except "legal professionals who may need to interview inmates for purposes of an investigation or pending legal action." JA058. It is clear, however, that such

18

professionals cannot abuse this privilege to record and publish a recorded client interview. For example, the ACLU references the written warning made to inmate Murdaugh's lawyer after he allegedly provided a recorded interview to the media. Appellant's Br. 8. This letter (which was attached to the ACLU's initial memorandum) specifically stated that "Attorney calls are provided to assist with legal claims, not for other unrelated purposes." JA066.

Likewise, the ACLU's contention that recording interviews with inmates for publication is not a form of "access" to these sources of information can be easily dismissed upon a review of the decisions in *Pell*, *Saxbe,* and *Houchins*. According to the ACLU, these rulings were based on the challenged policies being tailored to accommodate legitimate security concerns inherent to physical entry into a prison. Appellant's Br. 30. To the contrary, the prison's policy in *Pell* was not limited to contact with inmates inside the prison, but, instead, provided that "press and other media interviews with specific individual inmates will not be permitted." *Pell*, 417 U.S. at 819. Accordingly, while the media Plaintiffs *Pell* did highlight the advantages of "face-to-face interviews," telephone interviews were also prohibited. *See id.* at 835 (Powell, J., dissenting in part, concurring in part) (the "regulation of the California Department of Corrections…prohibits *all* personal interviews of

19

prison inmates by representatives of the news media") (emphasis added).[6]

Likewise, the Court identified two alternatives to personal contact interviews:

1. "[o]ne such alternative available to California prison inmates is communication by mail"; and

2. "inmates have an unrestricted opportunity to communicate with the press or any other member of the public through their families, friends, clergy, or attorneys who are permitted to visit them at the prison [and] provides another alternative avenue of communication between prison inmates and persons outside the prison."

*Id.* at 824 and 825.

Obviously, neither of these alternatives constitute "real-time communication between prisoners and the press."

Against this background, the *Pell* Court concluded that there was "no support in the words of the Constitution or in any decision of this Court" to "suggest that the Constitution imposes upon government the affirmative duty to make available to

---

[6] The lack of a meaningful distinction between "face-to-face" and telephonic interviews is apparent from the advantages of personal contact interviews advanced by the dissent in *Saxbe*. Specifically, only in such "discussion can a reporter put a question to an inmate and respond to his answer with an immediate follow-up question. Only in an interview can the reporter pursue a particular line of inquiry to a satisfactory resolution or confront an inmate with discrepancies or apparent inconsistencies in his story. Without a personal interview a reporter is often at a loss to determine the honesty of his informant or the accuracy of the information received." *Saxbe*, 417 U.S. at 854 (Powell, J., dissenting). Clearly, remote interviews conducted by audio or visual means have the same putative advantages over written communications.

journalists *sources of information* not available to members of the public generally."
*Id.* at 834-35. Accordingly, "access", as used by the Court, includes the ability to
interview and record prisoners whether in person or by phone for journalistic
purposes. This point is made abundantly clear by the Supreme Court's subsequent
opinion in *Houchins* involving a media demand "to interview inmates and make
sound recordings, films, and photographs for publication and broadcasting by
newspapers, radio, and television." *Houchins*, 438 U.S. at 3. Implicit in its holding
that the "public importance of conditions in penal facilities and the media's role of
providing information afford no basis for reading into the Constitution a right of the
public or the media to enter these institutions, with camera equipment, and take
moving and still pictures of inmates for broadcast purposes," *id.* at 9, is that
recordation of interviews is part and parcel of "access" to an inmate.[7]

Similarly, the available alternatives discussed in that case demonstrate that
audio/visual documentation of personal communications distinguishes such contact
from other forms of access. In the words of the Court:

---

[7] The dictionary definition of "access" includes "a *way or means* of approaching, getting, using, etc.". https://collinsdictionary.com/us/dictionary/english/access (emphasis added). In his separate opinion in *Houchins*, Justice Stewart explicitly equated restrictions on the "use [of] cameras and sound equipment" with "terms of access." *Houchins*, 438 U.S. at 17 (Stewart, J., concurring). At issue in that matter was the lower court's enjoining of prison official from "preventing [media] representatives 'from utilizing photographic and sound equipment or from utilizing inmate interviews in providing full and accurate coverage of the Santa Rita facilities.'" *Id.* at 24 (Stevens, J., dissenting).

> Petitioner cannot prevent respondents from learning about jail conditions in a variety of ways, albeit not as conveniently as they might prefer. Respondents have a First Amendment right to receive letters from inmates criticizing jail officials and reporting on conditions. *See Procunier v. Martinez*, 416 U.S., at 413-418. Respondents are free to interview those who render the legal assistance to which inmates are entitled. *See id.*, at 419. They are also free to seek out former inmates, visitors to the prison, public officials, and institutional personnel, as they sought out the complaining psychiatrist here.

*Id.* at 15.

Notably, these alternatives did not include personal contact or the recordation of personal contact interviews.

Accordingly, blanket prohibitions on personal contact interviews, including audio and visual recordings with inmates, are indistinguishable from those imposed by SCDC here, and similar prohibitions have been expressly approved by the Supreme Court. *See Saxbe*, 417 U.S. at 845 ("The District Court…held that the Policy Statement, insofar as it totally prohibited all press interviews at the institutions involved, violated the First Amendment. Although the court acknowledged that institutional considerations could justify the prohibition of some press-inmate interviews, the District Court ordered the petitioners to cease enforcing the *blanket prohibition* of all such interviews") (emphasis added). These cases also held that, given the clarity of the constitutional inquiry, it was unnecessary to address many of the arguments raised by the Plaintiff herein. *See id.* at 849 (although the lower courts preferred "a selective policy whereby prison officials could deny

interviews likely to lead to disciplinary problems…, it was unnecessary to engage in any delicate balancing of such penal considerations against the legitimate demands of the First Amendment"); *Pell*, 417 U.S. at 827 n. 5 ("Even with respect to inmates who may not be literate or articulate, however, there is no suggestion that the corrections officials would not permit such inmates to seek the aid of fellow inmates or of family and friends who visit them to commit their thoughts to writing for communication to individuals in the general public.  Merely because such inmates may need assistance to utilize one of the alternative channels does not make it an ineffective alternative, unless, of course, the State prohibits the inmate from receiving such assistance.").[8]  Thus, the argument that interviews through written correspondence are a constitutionally inadequate alternative means of exercising First Amendment rights must fail.[9]

To this end, it is not accurate to claim that "the challenged policy requires that the incarcerated person's views be editorialized through some other third-party speaker."  Appellant's Br. 31.  In addition to direct quotation from an inmate's

---

[8]  The *Saxbe* majority also felt it was unnecessary to address the dissent's contention that "the prevalence of functional illiteracy among the inmate population poses a serious difficulty; many prisoners are simply incapable of communicating effectively in writing."  *Saxbe v. Wash. Post Co.*, 417 U.S. at 854-855 (Powell, J., dissenting).

[9]  In the case of Mr. Bowman, the ACLU asserts that its planned "interview would detail [Mr. Bowman's] experience on death row, in his own words."  Appellant's Br. 1.  It is difficult to understand why a written narrative composed by the inmate could not effectively describe this experience.

correspondence, the ACLU could publish a photograph of the letter in the prisoner's own handwriting as has been done by other news outlets. JA123. It could also use a "voice over" to audibly present the inmate's words.[10] Thus, the prisoner's "voice" can be conveyed to the public without implicating the security and penological concerns addressed by SCDC policy.[11]

In this regard, the ACLU contends that SCDC invented these security and penological interests after the fact and that such "rationalizations" should be dismissed out of hand. This ignores the ACLU's introduction into the record of the chapter of regulations concerning inmate contact which expressly references associated security risks. JA054-059. These policies also highlight the impact on SCDC's limited resources should the Appellant prevail. To wit, SCDC Policy/Procedure GA-02.01.4.3 provides that:

> All approved news media representatives will be required to be escorted by at least one (1) SCDC employee assigned to the institution/building/area to be visited and by at least one (1) representative or designee of the Director's Staff at all times. Any person(s) designated by the Agency Director's Office to accompany a news media representative(s) will be briefed by the Agency Director's Office or a designated official prior to the tour/visit.

[10] The efficacy of such techniques is evident from documentaries such as Ken Burns' *Civil War* series where actors read from the personal correspondence of combatants.

[11] It must be noted that the ACLU has intentionally refused to publish correspondence from its "clients". As early as April 2, 2024, SCDC made it clear to the lower court and to the ACLU that its policies did not prohibit such publication. The ACLU's refusal to publish inmate letters can only be seen as gamesmanship.

JA056.

Due to the risks of coded verbal and nonverbal communications being conveyed in recorded real-time interviews, SCDC personnel would need to be extensively trained in order to effectively monitor these visits. Accordingly, the resulting allocation of resources cannot be dismissed as merely hypothetical.

Furthermore, the penological interests implicated by media contact with inmates has been thoroughly documented by the Supreme Court. *See Thornburgh v. Abbott*, 490 U.S. at 412 (limitation of "potential for coordinated disruptive conduct" and disorder among the prison population arising from "inferences about their fellow [inmates's] beliefs, sexual orientation, or gang affiliations"); *Turner*, 482 U.S. at 26-28 (prevention of the communication of escape plans and arrangement of assaults and other violent acts; reduction of the risk of "coordinated criminal activity" by limiting communication between gang members; and deterrence of the "development of informal organizations that threaten the core functions of prison administration"); *Saxbe*, 417 U.S. at 848-849 (preventing inmates from becoming "conspicuously publicized because [they] tend to become the source of substantial disciplinary problems that can engulf a large portion of the population at a prison"); *Pell*, 417 U.S. at 823, 827 and 831-32 (promotion of "the rehabilitation of those committed to its custody"; "keeping visitations at a manageable level"; and limiting inmates from becoming "virtual 'public figures'

within the prison society and gain[ing] a disproportionate degree of notoriety and influence among their fellow inmates [which can lead to] severe disciplinary problems."). Furthermore, as discussed above, these same decisions establish that the limitations at issue in the instant case are reasonably related to these concerns. Thus, the relevant factors of a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it" and the "impact [of the] accommodation of the asserted constitutional right…on guards and other inmates, and on the allocation of prison resources generally," *Turner*, 482 U.S. at 89-90, are clearly present in this case.[12]

## III. The Appellee's Policies Should Not Be Subject to Strict Scrutiny

The ACLU further claims that SCDC's policy should be evaluated under *Procunier v. Marinez*, 416 U.S. 296 (1974), as opposed to the less stringent standard employed by *Pell*, *Saxbe* and *Houchins*. In his dissent in *Saxbe*, Justice Powell advocated for the same position, *i.e.,* that "the ban against prisoner-press interviews" must be reviewed under the *Martinez* standard due to its impact on the constitutional rights of the media. *Saxbe*, 417 U.S. at 864-65 (Powell, J., dissenting). The majority, however, disagreed opining that "it is unnecessary to engage in any delicate

---

[12] The ACLU makes much of a statement made to the press by SCDC's current director decades after the promulgation of the policy at issue reflecting concern over victims' rights. The SCDC does not deny that the policy helps to advance this laudable objective, but it is clear that this is not sole or even a significant purpose of the policy.

balancing of such penal considerations against the legitimate demands of the First Amendment." *Id.* at 849.

In addition, subsequent decisions have narrowly confined the reach of *Martinez*. *See Turner*, 482 U.S. at 87-89 and 93 (1987) (rejecting the application of *Martinez*'s least restrictive means standard due to the intervening rulings in *Pell* and its progeny). For example, *Thornburgh v. Abbott*, 490 U.S. 401 (1989), explicitly rejected the notion that "that *Martinez* should, or need, be read as subjecting the decisions of prison officials to a strict 'least restrictive means' test." *Id.* at 411. Consequently, it concluded that it was necessary to partially overrule the prior decision. *See id.* at 413 ("In so doing, we recognize that it might have been possible to apply a reasonableness standard to all incoming materials without overruling *Martinez*: we instead could have made clear that *Martinez* does not uniformly require the application of a 'least restrictive alternative' analysis. We choose not to go that route, however, for we prefer the express flexibility of the *Turner* reasonableness standard.). Thus, proper application of precedent "require[d] that *Martinez* be limited to regulations concerning outgoing *correspondence*." *Id.* (emphasis added).

In this context, the ACLU argues that "correspondence" must be interpreted to include "outgoing prisoner speech" in any medium. This argument ignores the fact that the personal contact interviews at issue in *Pell*, *Saxbe* and *Houchins* involved forms of outgoing speech. This was particularly true in *Houchins* which

directly addressed audio and visual documentation of such personal contact. The refusal of these decisions to apply *Martinez* to such outgoing communications requires rejection of the ACLU's argument in this case.

The ACLU makes much of a supposed distinction between outgoing written correspondence and outgoing real-time audio or video communication. This supposed distinction is not supported by case law. To the contrary, the *Thornburgh* Court offered the following analysis:

> a careful reading of *Martinez* suggests that our rejection of the regulation at issue resulted not from a least restrictive means requirement, but from our recognition that the regulated activity centrally at issue in that case -- outgoing personal correspondence from prisoners -- did not, by its very nature, pose a serious threat to prison order and security. We pointed out in *Martinez* that outgoing correspondence that magnifies grievances or contains inflammatory racial views cannot reasonably be expected to present a danger to the community inside the prison.

*Thornburgh*, 490 U.S. at 411-412 (citations omitted).

It is hardly a stretch to suggest that a multimedia broadcast "magnif[ying] grievances or contain[ing] inflammatory racial views" could produce more "danger to the community inside the prison" than an outgoing email or a letter. Indeed, this conclusion is compelled by the ACLU's own claim that audio/visual presentation of an inmate's own words and expressions is more potent that than the written word. Thus, after decades of being narrowly construed, it would be inappropriate to expand the inflexible standard of *Martinez* beyond its limited scope of application.

28

## IV.   Separate Analysis of SCDC Policy In Relation To An Individual Inmate Is Inappropriate.

The ACLU now seeks to add urgency to its argument through reliance on the scheduled execution of a non-party to this litigation, inmate Marion Bowman.  In this context, it is important that the focus remain on the alleged injury to the Appellant's newsgathering ability, not on any potential consequences for Mr. Bowman.  Neither is it appropriate to assess the viability of the ACLU's general policy in relation to single proposed interview.

The ACLU's requested approach was specifically rejected in *Saxbe*.  In that litigation:

> The District Court and the Court of Appeals…decree[d] a selective policy whereby prison officials could deny interviews likely to lead to disciplinary problems. In the expert judgment of the petitioners, however, such a selective policy would spawn serious discipline and morale problems of its own by engendering hostility and resentment among inmates who were refused interview privileges granted to their fellows. The Director of the Bureau testified that "one of the very basic tenets of sound correctional administration" is "to treat all inmates incarcerated in [the] institutions, as far as possible, equally."

*Saxbe*, 417 U.S. at 849.

While noting that "[t]his expert and professional judgment is, of course, entitled to great deference", *id.*, the Court held that "it is unnecessary to engage in any delicate balancing of such penal considerations against the legitimate demands of the First Amendment [since the limitation on access was] justified by…'the truism

that prisons are institutions where public access is generally limited.'" *Id.* Thus, binding precedent establishes that SCDC need not engage in a "selective policy" whereby prison officials assess whether any particular "interview is likely to lead to disciplinary problems" or to conduct a "delicate balancing" of the impact of a single interview on legitimate "penal considerations". Thus, granting a preliminary injunction allowing a recorded personal contact interview with Mr. Bowman would effectively require the "selective policy" that has already been rejected by the Supreme Court.[13]

Furthermore, even if consideration of the individual merits of a Bowman interview was required, the ACLU has not carried its burden to obtain temporary injunctive relief. In this regard, *Winter v. NRDC, Inc.*, 555 U.S. 7 (2008), requires that a "plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. Notably, that decision also opined that:

> A preliminary injunction is an extraordinary remedy never awarded as of right. *Munaf*, 553 U.S., at 689-690, 128 S. Ct. 2207, 171 L. Ed. 2d 1. In each case, courts "must balance the competing claims of injury and must consider the effect on each

---

[13] In its brief, the ACLU asserts that "[b]ut for the interview ban, ACLU-SC would record and publish interviews with incarcerated people on many topics…." Appellant's Br. 9. Consequently, a ruling allowing a personal contact interview with Bowman would open the floodgates for serial litigation relating to future recorded interview requests.

party of the granting or withholding of the requested relief." *Amoco Production Co.*, 480 U.S., at 542, 107 S. Ct. 1396, 94 L. Ed. 2d 542.

*Id.* at 24.

Accordingly, the Court cautioned against too much leniency in evaluating the Plaintiff's burden and stressed the need for consideration of the "overall public interest", including the public interest in the furtherance of the government's mission. *See id.* at 27-28 and 34-35.

The proper application of the *Winter* factors is demonstrated by a recent First Amendment case from this circuit, *Roswell v. Mayor*, 671 F. Supp. 3d 607 (D.Md. 2023), aff'd 2023 U.S. App. LEXIS 33595 (4th Cir. December 19, 2023) (*per curiam*). To wit:

> The Court cannot issue a preliminary injunction absent a "clear showing" that all four requirements are satisfied. *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 979 F.3d 219, 226 (4th Cir. 2020), rev'd on other grounds, 2 F.4th 330 (4th Cir. 2021); accord *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013). The plaintiff "bears the burden of establishing that each of these factors supports granting the injunction." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (citation omitted). Thus, a court need not address all four *Winter* factors if one or more of those factors is not satisfied. *Henderson ex rel. NLRB v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018).
>
> In addition, the movant must show more than a "grave or serious question for litigation"; instead, the moving party bears the "heavy burden" of making a "clear showing" that he satisfies all four factors. *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 345-47 (4th Cir. 2009); *see also Int'l Bhd.*

*of Teamsters v. Airgas, Inc.*, 239 F. Supp. 3d 906, 912 (D. Md. 2017).

*Id.* at 616.

The ACLU, however, contends that it is exempt from these rigorous burdens since this case involves a government restraint on its speech.

As discussed above, any restraint on the ACLU, as opposed to a restraint on inmates, actually involves its newsgathering activities. These limitations on access to prisoners are clearly not the type of "content-based speech restriction" which led to the results in decisions such as *United States v. Playboy Entm't Group*, 529 U.S. 803, 816 (2000) (prohibition of daytime broadcast of sexually explicit material); *Reno v. ACLU*, 521 U.S. 844, 879 (1997) (dealing with Communications Decency Act internet restrictions). Therefore, when focus is placed on whose rights are at issue – *i.e.,* the ACLU's, not the inmate's - the ACLU does not merit the lenient probative burden suggested by its briefing. Since binding Supreme Court precedent explicitly holds that information gathering organizations have no greater right of access to inmates or to record their speech than does the general public, the ACLU has little or no chance of success on the merits.[14]  *See Di Biase v. SPX Corp.*, 872

---

[14] This conclusion seems obvious even without consideration of the materials submitted by SCDC in support of its FRCP Rule 12(b)(1) motion.  Should the Court feel inclined to review materials outside the pleadings in this respect, SCDC would crave reference to the Affidavits of Chrysti Shain and Bryan Antonelli.  JA129-135.

F.3d 224, 230 (4th Cir. 2017) ("A plaintiff need not establish a 'certainty of success,' but must make a clear showing that he is likely to succeed at trial.").

## CONCLUSION

As set forth above, established caselaw demonstrates that the Appellant has no legal right to the relief requested in this case. Accordingly, the District Court's dismissal of this matter should be affirmed.

Likewise, the Appellant's request for a preliminary injunction flies in the face of four decades of settled Supreme Court precedent. Therefore, the District Court's conclusion that the Appellant failed to clearly establish a likelihood of success on the merits cannot be considered an abuse of its discretion. Thus, the denial of this relief should be affirmed.

Respectfully submitted,

WOMBLE BOND DICKINSON (US) LLP

By: /s/ Kevin A. Hall
    Federal Bar No. 5375
    kevin.hall@wbd-us.com
    M. Todd Carroll
    Federal Bar No. 9742
    todd.carroll@wbd-us.com
    1221 Main Street, Suite 1600
    Columbia, South Carolina 29201
    803.454.6504

    David M. Collins
    Federal Bar No. 223
    david.collins@wbd-us.com
    5 Exchange Street
    Charleston, South Carolina 29401
    843.722.3400

    *Counsel for Defendant-Appellee*

October 15, 2024
Columbia, SC

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 7,287 words.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally-spaced typeface using Microsoft Word 2010 in 14-point font size, Times New Roman type style.

WOMBLE BOND DICKINSON (US) LLP

By: /s/ Kevin A. Hall

*Counsel for Defendant-Appellee*

October 15, 2024

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on this 15th day of October, 2024, I caused this Appellee's

Response Brief to be filed electronically with the Clerk of the Court using the

CM/ECF System, which will send notice of such filing to counsel of record.

*Counsel for Appellant:*

Allen Chaney                          Emerson Sykes
ACLU of South Carolina                ACLU
P.O. Box 1668                         125 Broad Street, 18th Floor
Columbia, SC 29202                    New York, NY 11230
achaney@aclusc.org                    esykes@aclu.org


David Fathi                           Corene Kendrick
ACLU National Prison Project 915 15th  ACLU National Prison Project 425
Street NW, 7th Floor                  California St., Ste 700
Washington, DC 20005                  San Francisco, CA 94104
dfathi@aclu.org                       ckendrick@aclu.org



/s/ Kevin A. Hall
Kevin A. Hall