**No. 24-1882**
**CAPITAL-RELATED CASE - EXECUTION SCHEDULED 11/29/24**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF SOUTH CAROLINA,

*Plaintiff-Appellant*,

v.

BRYAN STIRLING, in his official capacity as director of the South
Carolina Department of Corrections,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of South Carolina
No. 3:24-cv-00906-JDA
Hon. Jacqueline D. Austin

**REPLY BRIEF OF PLAINTIFF-APPELLANT**

Allen Chaney
ACLU of South Carolina
P.O. Box 1668
Columbia, SC 29202
achaney@aclusc.org

David Fathi
ACLU Foundation
915 15th Street NW, 7th Floor
Washington, DC 20005
dfathi@aclu.org

Emerson Sykes
ACLU Foundation
125 Broad Street, 18th Floor
New York, NY 11230
esykes@aclu.org

Corene Kendrick
ACLU Foundation
425 California St., Ste 700
San Francisco, CA 94104
ckendrick@aclu.org

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ ii

INTRODUCTION ....................................................................................... 1

ARGUMENT ............................................................................................... 3

   I. ACLU-SC Adequately Alleges a First Amendment Violation and the
     District Court Erred in Dismissing the Case ...................................... 3

       A.    Defendant cannot prevail on a motion to dismiss by controverting
            the complaint's factual allegations. ........................................... 3

       B.    Plaintiff's as-applied challenge does not seek *access* to its
            incarcerated clients, but rather freedom to publish their words. ........... 5

       C.    Defendant's policy is facially unconstitutional as it gags "anyone"
            from sharing the voices of people incarcerated in SCDC prisons. ..... 10

       D.    *Martinez*, not *Turner*, is the governing standard. ................................ 11

  II. Plaintiff Is Entitled to Preliminary Relief to Allow It to Publish
     Mr. Bowman's Communications Before South Carolina Executes Him ...... 14

       A.    Plaintiff is likely to succeed on the merits of its First Amendment
            claims. ...................................................................................... 15

       B.    Plaintiff will suffer irreparable harm without a preliminary
            injunction. ................................................................................ 18

       C.    The remaining *Winter* factors favor Plaintiff. .................................... 18

CONCLUSION ........................................................................................... 19

CERTIFICATE OF COMPLIANCE .......................................................... 21

# TABLE OF AUTHORITIES

## Cases

*Ali v. Dixon*,
  912 F.2d 86 (4th Cir. 1990) .......................................................... 16

*Beard v. Banks*,
  548 U.S. 521 (2006).................................................................... 18

*Billups v. City of Charleston, S.C.*,
  961 F.3d 673 (4th Cir. 2020) ................................................. 11, 12

*Bose Corp. v. Consumers Union of U.S., Inc.*,
  466 U.S. 485 (1984).....................................................................4

*Branzburg v. Hayes*,
  408 U.S. 665 (1972).....................................................................8

*Calif. First Amend. Coal. v. Woodford*,
  299 F.3d 868 (9th Cir. 2002) ....................................................... 12

*Cheng v. Neumann*,
  51 F.4th 438 (1st Cir. 2022)...........................................................4

*City of Lakewood v. Plain Dealer*,
  486 U.S. 750 (1988).................................................................... 16

*Clark v. Cmty. for Creative Non–Violence*,
  468 U.S. 288 (1984).................................................................... 11

*Disability Rts. S.C. v. McMaster*,
  24 F.4th 893 (4th Cir. 2022) ..........................................................2

*Elrod v. Burns*,
  427 U.S. 347 (1976).................................................................... 18

*First Amend. Coal. of Arizona, Inc. v. Ryan*,
  938 F.3d 1069 (9th Cir. 2019) ..................................................... 14

*Fusaro v. Cogan*,
  930 F.3d 241 (4th Cir. 2019) ....................................................... 12

*Giovani Carandola, Ltd. v. Bason*,
  303 F.3d 507 (4th Cir. 2002) ....................................................... 19

*Grutter v. Bollinger*,
  539 U.S. 306 (2003).................................................................... 13

*Houchins v. KQED, Inc.*,
   438 U.S. 1 (1978).................................................................. 5, 6, 8, 9

*King v. Rubenstein*,
   825 F.3d 206 (4th Cir. 2016) ................................................... 3, 4

*League of Women Voters of N.C. v. North Carolina*,
   769 F.3d 224 (4th Cir. 2014) ....................................................... 14

*Mann v. Smith*,
   796 F.2d 79 (5th Cir. 1986) ...........................................................5

*Martin v. Duffey*,
   858 F.3d 239 (4th Cir. 2017) ................................................... 3, 4

*McCabe v. Arave*,
   827 F.2d 634 (9th Cir. 1987) ....................................................... 18

*Morrison v. Hall*,
   261 F.3d 896 (9th Cir. 2001) .........................................................4

*Murphy v. Missouri*,
   814 F.2d 1252 (8th Cir. 1987) ..................................................... 18

*Pell v. Procunier*,
   417 U.S. 817 (1974)........................................................... passim

*People for Ethical Treatment of Animals, Inc. v. N.C. Farm Bureau Fed., Inc.*,
   60 F.4th 815 (4th Cir. 2023) .........................................................2

*Procunier v. Martinez*,
   416 U.S. 396 (1974)............................................... 11, 13, 14, 16

*Quinn v. Nix*,
   983 F.2d 115 (8th Cir. 1993) ....................................................... 16

*R.A.V. v. City of St. Paul*,
   505 U.S. 377 (1992)......................................................................3

*Regan v. Time Inc.*,
   468 U.S. 641 (1984)......................................................................3

*Saxbe v. Wash. Post Co.*,
   417 U.S. 843 (1974)........................................................... passim

*Scott v. Baltimore Cnty., Md.*,
   101 F.4th 336 (4th Cir. 2024) .......................................................2

*Smith v. Daily Mail Pub. Co.*,
   443 U.S. 97 (1979).........................................................................6

*Stuart v. Camnitz*,
    774 F.3d 238 (4th Cir. 2014) ....................................................... 12

*Thornburgh v. Abbott*,
    490 U.S. 401 (1989).............................................................. 13, 14

*Turner v. Safley*,
    482 U.S. 78 (1987).................................................................. passim

*United States v. Virginia*,
    518 U.S. 515 (1996)...................................................................... 16

*Winter v. NRDC, Inc.*,
    555 U.S. 7 (2008)................................................................... 15, 18

*Zemel v. Rusk*,
    381 U.S. 1 (1965)............................................................................9

## Other Authorities

Ministry Against the Death Penalty, *About Sister Helen Prejean*,
    https://www.sisterhelen.org/about/ ............................................. 11

*Ramey v. Parson*, ACLU Court Cases (Nov. 29, 2022),
    https://www.aclu.org/cases/ramey-v-parson ............................... 15

## Rules

S.C. App. Ct. R. 1.3 .............................................................................9

S.C. App. Ct. R. Preamble ..................................................................9

**INTRODUCTION**

This case is not complicated; it is about whether Defendant can silence the voices of incarcerated people in South Carolina. Defendant's extreme policy and practice gags not only the people incarcerated in South Carolina Department of Corrections (SCDC) prisons from speaking to, or via, the news media, but also prevents advocates, attorneys, family, friends, clergy, or reporters from amplifying those voices. The challenged policy is universal: it applies to "anyone" who interacts with a person in SCDC custody, no matter the form of media or subject of the speech. Dkt. 24 at 22–23.[1] Under this overbroad policy as written and enforced by Defendant, if an incarcerated man were to leave a phone message singing "Happy Birthday" to his child, and his wife posted the voicemail on her Facebook account for friends, family, and community to hear, then both incarcerated husband and free wife could face discipline and a loss of privileges for her actions. Accordingly, the challenged policy facially violates the First Amendment.

The policy also is unconstitutional as applied to Plaintiff ACLU Foundation of South Carolina (ACLU-SC), which seeks to publish the speech of its incarcerated clients, including on matters of literal life and death. Plaintiff asks for a preliminary injunction to permit it to publish and air in the coming weeks an audio interview with its client Marion Bowman, before his execution on November 29, 2024. The interview—designed to educate the people of South Carolina (and the broader world) about the person to be killed in their name—would include Mr. Bowman

---

[1] Citations are to this Court's docket numbers and page numbering assigned by its Electronic Case Filing (ECF) system, rather than the page of the document.

1

detailing in his own words his experiences on Death Row, how he lives with the knowledge of his impending death, and his clemency petition.[2]

The district court correctly held ACLU-SC has standing, because it alleges Defendant's "Policy prohibits Plaintiff from engaging in specific, planned, and protected First Amendment conduct," and Plaintiff suffered "an imminent injury that satisfies the requirements of Article III." JA 185 (citations and internal quotation marks omitted).[3] However, the district court erroneously held that Plaintiff did not state a claim because it has no First Amendment right to publish audio interviews with its clients, thus summarily dismissing the case with no further analysis of the as-applied or facial challenge, and denying a preliminary injunction as to Mr. Bowman. JA 190.

The touchstone in this Circuit is "the First Amendment gives the benefit of any doubt to protecting rather than stifling speech." *People for Ethical Treatment of Animals, Inc. v. N.C. Farm Bureau Fed., Inc*., 60 F.4th 815, 820 (4th Cir. 2023) (cleaned up). This is in keeping with a robust body of First Amendment

---

[2] Plaintiff also seeks to publish the speech of its client Sofia Cano, whom ACLU-SC represents in a separate lawsuit about SCDC's failure to provide her with medically necessary healthcare.

[3] In a footnote, Defendant foreswears any challenge to the lower court holding that Plaintiff has standing to assert First Amendment claims, but in the next sentence encourages this Court to consider the issue, citing Defendant's arguments below. Dkt. 24 at 10 n.3. Although standing can be addressed *sua sponte*, *see Disability Rts. S.C. v. McMaster*, 24 F.4th 893, 899-900 (4th Cir. 2022), Defendant cannot raise the issue merely by "crav[ing] reference" to arguments he chose not to present to this Court. Dkt. 24 at 10 n.3. Indeed, "attempting to adopt by reference arguments made in the district court is a practice that has been consistently and roundly condemned by the Courts of Appeals." *Scott v. Baltimore Cnty., Md.,* 101 F.4th 336, 341 (4th Cir. 2024) (cleaned up).

jurisprudence rooted in the idea that the government may not muzzle speech merely because it disapproves of the speaker —including incarcerated people or their advocates — or the message. *See, e.g., R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) (holding that "content-based restrictions are presumptively invalid"); *Regan v. Time Inc.*, 468 U.S. 641, 648-49 (1984) ("Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment."). Defendant's policy does exactly that, and it cannot survive even the most lenient scrutiny.

Accordingly, this Court should (a) reverse the district court's dismissal of the complaint, (b) grant Plaintiff's request for a preliminary injunction as to Mr. Bowman before his scheduled execution, and (c) remand the case to the district court for further proceedings.

## ARGUMENT

## I.   ACLU-SC Adequately Alleges a First Amendment Violation and the District Court Erred in Dismissing the Case

### A.   Defendant cannot prevail on a motion to dismiss by controverting the complaint's factual allegations.

A motion to dismiss "tests the sufficiency of a complaint; it does not, however, resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (citations omitted). A court must take "all well-pleaded allegations in the plaintiff's complaint as true" and draw all reasonable inferences in the plaintiff's favor. *Martin v. Duffey*, 858 F.3d 239, 248 (4th Cir. 2017) (citations omitted). "[I]n First Amendment cases, appellate

courts have 'an obligation to make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Cheng v. Neumann*, 51 F.4th 438, 443 (1st Cir. 2022) (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984)).

Defendant's principal response is to dispute the factual claims set forth in Plaintiff's complaint, but it is black-letter law that a defendant cannot prevail on a Rule 12(b)(6) motion to dismiss simply by controverting the well-pleaded allegations of the complaint. *See King, supra; Martin, supra.* The complaint alleges— and this Court must accept as true—that Defendant's policy prohibits the dissemination of prisoner speech in any form, including words in written correspondence. *See* JA 006 ¶ 2 ("although correspondence by mail is allowed, publication of a prisoner's written speech is similarly prohibited"). Defendant's retort that the allegation is "not true," (Dkt. 24 at 15), and resting his entire argument on the assertion that South Carolina prisoners' written words can be disseminated freely, carries no weight at this stage. The court may not resolve a dispute of fact *against* the well-pleaded allegations in the complaint. *Martin*, 858 F.3d at 248.

Regardless, even if undisputed facts established that dissemination of incarcerated persons' written words were permitted, Plaintiff would still state a First Amendment claim. Courts have recognized in the prison context that suppression of one medium of communication is not justified by the fact that other media remain available. *See, e.g., Morrison v. Hall*, 261 F.3d 896, 904 & n.7 (9th Cir. 2001) (holding that restrictions on magazines and newspapers were not justified by the fact

that radio and television remained available); *Mann v. Smith*, 796 F.2d 79, 83 (5th Cir. 1986) (similar).

> B.    Plaintiff's as-applied challenge does not seek *access* to its incarcerated clients, but rather freedom to publish their words.

The district court incorrectly concluded Plaintiff's claims are controlled by a trio of 50-year-old Supreme Court cases about "newsmen's" ability to enter a prison or jail with cameras, recording equipment, and the like, seeking to **access** and interview individual incarcerated people, often previously unknown to the reporters. *See Pell v. Procunier*, 417 U.S. 817, 834 (1974) (holding "newsmen have no constitutional right of access to prisons or their inmates beyond that afforded the general public"); *Saxbe v. Wash. Post Co.*, 417 U.S. 843, 846–47 (finding "newsmen . . . may not enter the prison and insist on visiting an inmate with whom they have no [pre-existing] relationship"); *Houchins v. KQED, Inc.*, 438 U.S. 1, 9 (1978) ("The public importance of conditions in penal facilities and the media's role of providing information afford no basis for reading into the Constitution a right of the public or the media to enter these institutions, with camera equipment, and take moving and still pictures of inmates for broadcast purposes.").

The district court's ruling was erroneous. *Pell*, *Saxbe*, and *Houchins* are simply inapposite, as ACLU-SC does not seek *access* to Defendant's prisons to interview incarcerated people with whom it has no relationship. ACLU-SC made clear that it *separately and currently has* telephonic and in-person access to people incarcerated at SCDC prisons, specifically its clients Mr. Bowman and Ms. Cano. *See* JA 012 ¶ 35; JA 013 ¶ 44.

5

The crux of Plaintiff's as-applied argument is that the challenged policy restricts ACLU-SC's First Amendment right to publish its incarcerated clients' first-person speech, once that speech is lawfully obtained through its visits with clients to whom it already has access. *See, e.g.*, JA 006–JA 007 ¶ 3. This after-the-fact muzzling is a paradigmatic example of a prior restraint. *See Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 105–06 (1979) (holding it is an unconstitutional prior restraint to punish the publication of information that was lawfully obtained). Here, ACLU-SC can interview Ms. Cano and Mr. Bowman and lawfully obtain information, but Defendant's policy punishes any subsequent publication of that information. The district court erred in concluding Plaintiff's claim was simply one of "access" to interview its clients.

ACLU-SC seeks to broadcast and air audio interviews with two specific people with whom it already has pre-existing relationships. Such a factual scenario was precisely identified in *Pell*, *Saxbe*, and *Houchins* as distinct from those cases' focus on a generic "newsman's" ability to demand an interview with a prisoner. While Defendant cites portions of these three cases in his brief, he conspicuously fails to acknowledge that all three made clear that their holdings did not apply to situations much more factually analogous to the facts at hand here.

**First**, in *Pell*, the Supreme Court noted that the California prison policy

> does not seal the inmate off from personal contact with those outside the prison. Inmates are permitted to receive limited visits from members of their families, the clergy, their *attorneys*, and friends of prior acquaintance.

6

> [. . .] If a member of the press fell within any of these categories, *there is no suggestion that he would not be permitted to visit with the inmate.* More importantly, however, *inmates have an unrestricted opportunity to communicate with the press or any other member of the public through their families, friends, clergy, or attorneys who are permitted to visit them at the prison.*

417 U.S. at 824–25 (emphasis added, footnote omitted).

Here, Plaintiff alleges that, as retained counsel to Mr. Bowman and Ms. Cano, it is permitted access to visit with and interview its clients. The complaint alleges that under Defendant's policy as written and enforced, ACLU-SC is not allowed to then share its clients' communications with members of the public as part of its advocacy and representation.

**Second**, in *Saxbe*, decided the same day as *Pell*, the Supreme Court observed that under the Federal Bureau of Prisons' policy,

> inmates' families, their attorneys, and religious counsel are accorded liberal visitation privileges. Even friends of inmates are allowed to visit, although their privileges appear to be somewhat more limited. . . . [N]ewsmen, . . . like other members of the public, may enter the prisons to visit friends or family members. But again like members of the general public, they may not enter the prison and insist on visiting an inmate with whom they have no such relationship. *There is no indication on this record that Policy Statement 1220.1A has been interpreted or applied to prohibit a person, who is otherwise eligible to visit and interview an inmate, from doing so merely because he is a member of the press.*
>
> [. . .] [I]t is apparent that the sole limitation imposed on newsgathering by Policy Statement 1220.1A is no more than a particularized application of the general rule that nobody may enter the prison and designate an inmate

> whom he would like to visit, unless the prospective visitor
> is a *lawyer*, clergyman, relative, or friend of that inmate.

417 U.S. at 846–47, 849 (emphasis added, citations and footnotes omitted).

Defendant's policy goes much farther than those at issue in *Pell* or *Saxbe*, by barring the speech of persons or entities who otherwise are permitted to speak with an incarcerated person in South Carolina prisons.

**Third**, four years later in *Houchins*, the Supreme Court reiterated that while a jail's policies could limit reporters' access, any argument related to newsmen's "special privilege of access" —which Plaintiff is *not* arguing in its complaint—must be "distinguished from a *right to publish* information which has been obtained." 438 U.S. at 10, 12 (emphasis added). The Court made clear that in other cases involving prior restraint—similar to the claim Plaintiff asserts here— it upheld the freedom to "*communicate* information once it is obtained" because "the government cannot restrain communication of whatever information the media acquire—and which they elect to reveal." 438 U.S. at 9-10 (emphasis in original).

**Finally**, Defendant's reliance on *Branzburg v. Hayes*, 408 U.S. 665, 707 (1972) is entirely misplaced, as that case related to whether reporters could be compelled to appear and testify before a criminal grand jury. Dkt. 24 at 18. The Court took pains in *Branzburg* to emphasize it was not a case about "prior restraint or restriction on what the press may publish," but rather whether reporters could be subpoenaed in criminal prosecutions. 408 U.S. at 681. In *Houchins*, the Court noted that *Branzburg* simply stood for the proposition that the First Amendment does not compel the government "to supply information" without limits. 438 U.S. at 10–11.

Defendant also cites *Zemel v. Rusk*, 381 U.S. 1, 17 (1965) for the proposition that "the right to speak and publish does not carry with it the unrestrained right to gather information." Dkt. 24 at 18. Again, that is not what is at stake in the instant case. *Zemel* involved whether an American journalist could visit Cuba despite travel restrictions that applied generally to all United States citizens, and the *Zemel* court held the First Amendment was not implicated. 381 U.S. at 16; *see also Houchins*, 417 U.S. at 11 (reiterating that no First Amendment right was at stake in *Zemel* because it dealt with a supposed "right of access to news sources"). Here, Plaintiff is able to lawfully gather the information in question; Defendant's policy operates solely to prohibit its publication.

In sum, ACLU-SC's as-applied claim is not a "freedom of the press" or a "right of access" argument. By prohibiting Plaintiff from publishing its incarcerated clients' speech, which it has lawfully obtained, the policy restricts the organization's right to speak on matters of public importance. Therefore, the district court erred in holding that Plaintiff had stated no First Amendment claim, and this Court should reverse its grant of Defendant's motion to dismiss.[4]

---

[4] As retained counsel to Ms. Cano and Mr. Bowman, Plaintiff has an ethical obligation to zealously advocate for its clients. *See* S.C. App. Ct. R. 1.3 cmt. 1 ("A lawyer must also act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf."). Therefore, Defendant's gratuitous accusation that ACLU-SC is somehow engaged in "gamesmanship" by not yet publishing "inmate letters" from its clients, Dkt. 24 at 29 n.11, is not well-taken. Counsel employed by Plaintiff are abiding by their professional obligation to "demonstrate respect for the legal system" and "to uphold legal process" while exercising their duty "to challenge the rectitude of official action." S.C. App. Ct. R. Preamble, cmt. 5. After the threats Defendant made against another attorney for
(cont'd)

C.    Defendant's policy is facially unconstitutional as it gags "anyone"
     from sharing the voices of people incarcerated in SCDC prisons.

The district court failed to conduct *any* analysis of Plaintiff's facial challenge to the policy, conflating that claim with the court's erroneous analysis of the as-applied challenge. This was improper; this Court should reverse the dismissal and remand the case for a proper analysis of the facial challenge.

As set forth in the complaint, far from alleging a special right of access, ACLU-SC asserts that the challenged policy applies to "anyone." JA 008 at ¶ 13 (quoting GA-02.01.8). Defendant concedes the policy applies to "anyone." Dkt. 24 at 22-23. Indeed, that is one reason ACLU-SC challenged the law both facially and as applied to its own planned activities. *See* JA 014–JA 015 at ¶¶ 50–59; 62–64; *see also* Dkt. 16, Part I.D (discussion of facial challenge).

As noted *supra*, Defendant's policy and practice is so broad and extreme that an incarcerated person and his family could be punished if his family—who were approved for phone, video, or in-person visits— recorded a phone call of the incarcerated person singing "Happy Birthday" to his child, and that recording was posted on social media. The policy, as detailed in the complaint and opening brief, would also apply to members of the clergy. Notably, the Supreme Court in *Pell* and *Saxbe* specifically discussed clergy members being able to amplify the voices of incarcerated people whom they visited. *See supra* Part I.A.

An illustrative example is relevant to the facts at hand: The death penalty abolitionist Sister Helen Prejean serves as a pastoral counselor to condemned

sharing his client's words, *see* JA 026–27, JA 066, Plaintiff has chosen to not risk censure of itself or punishment of its clients.

persons facing execution, counseling them before their execution, and being present to bear witness when the state kills them.[5] She publicly advocates to courts and elected officials to spare these people by, among other methods, sharing the words of condemned men and women, in their own voices, on traditional and social media.[6] Such advocacy is unremarkable in other death penalty states, but if Sister Helen dared to record and share the words of Mr. Bowman or any others to whom she was ministering on South Carolina's Death Row, she would face reprisal, and the incarcerated person would face punishment from SCDC. There is no legitimate penological reason to have a blanket regulation muzzling "anyone"—including people such as the wife of an incarcerated man, Sister Helen, or the ACLU-SC— from simply airing or publishing the incarcerated person's words.

> D.   _Martinez_, not _Turner_, is the governing standard.

Because, as the district court held, "the Policy prohibits Plaintiff from engaging in specific, planned, and protected First Amendment conduct," JA 185, the First Amendment is implicated. When state action implicates the First Amendment, it must be subjected to some level of scrutiny. _See, e.g._, _Clark v. Cmty. for Creative Non–Violence_, 468 U.S. 288, 293 n.5 (1984) (requiring a showing "that the First Amendment even applies"); _Billups v. City of Charleston, S.C._, 961 F.3d 673, 682 (4th Cir. 2020) ("If a protected First Amendment right is involved, however, we are

---

[5] _See generally_, Ministry Against the Death Penalty, _About Sister Helen Prejean_, https://www.sisterhelen.org/about/.

[6] _See, e.g._, https://www.sisterhelen.org/press-release-archive/; https://x.com/helenprejean; https://www.instagram.com/helenprejean/; https://www.facebook.com/SisterHelenPrejean.

obliged to then assess whether the governmental action in question infringes that right."). The questions, then, are (a) what level of scrutiny applies and (b) whether the challenged action survives that scrutiny. *See, e.g.*, *Billups*, 961 F.3d 673, 684 (noting "we would usually begin by determining the applicable level of scrutiny"); *Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019) ("Laws that impinge upon speech receive different levels of judicial scrutiny depending on the type of regulation and the justifications and purposes underlying it.") (alteration omitted) (quoting *Stuart v. Camnitz*, 774 F.3d 238, 244 (4th Cir. 2014)).

To the extent Defendant concedes the policy is subject to First Amendment scrutiny at all, he contends it is governed by *Turner v. Safley*, 482 U.S. 78 (1987). Dkt. 24 at 8 n.2, 10, 16, 30, 31-32. But "[t]he Supreme Court has never applied *Turner* in a case such as this one, where the regulation promulgated by prison officials is centrally concerned with restricting the rights of outsiders rather than prisoners." *Calif. First Amend. Coal. v. Woodford*, 299 F.3d 868, 878 (9th Cir. 2002). *Woodford* involved restrictions on the ability of members of the public to witness executions, which involved entering the prison and observing the execution from a room adjacent to the death chamber. *Id*. at 870–71. The court concluded that it was bound by the law of the case to apply the *Pell/Turner* standard to these restrictions but implied that it would apply the more demanding test set forth in

*Procunier v. Martinez*, 416 U.S. 396 (1974), if it were deciding the question *de novo*. *Id*. at 878-79.[7]

Similarly here, the challenged regulation is centrally concerned with restricting the rights of outsiders—like Plaintiff—rather than incarcerated people; the *Turner* standard is therefore inapposite. Defendant concedes, as he must, that *Martinez* applies to "regulations concerning outgoing correspondence" (Dkt. 24 at 32, *quoting Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989)), but asserts, *ipse dixit*, a distinction between outgoing written communication and outgoing oral communications. This distinction finds no support in *Abbott,* which rests on the differing security risks posed by communications entering the prison compared to those leaving it, not on the form or medium of the communication. *See id*. ("The implications of outgoing correspondence for prison security are of a categorically lesser magnitude than the implications of incoming materials[.]").

Defendant's written/non-written communication distinction is also irrelevant to this case, as Plaintiffs' complaint clearly alleged that Defendant's policy bars publication of prisoners' written words as well as their recorded speech, an allegation the district court was required to accept as true. *See* JA 006 ("[A]lthough correspondence by mail is allowed, publication of a prisoner's written speech is similarly prohibited."). Defendant's policy restricting outgoing communications is subject to scrutiny under *Martinez*, not *Turner.*

---

[7] Defendant incorrectly suggests that the *Martinez* test constitutes "strict scrutiny." Dkt. 24 at 31. It does not. *See Grutter v. Bollinger*, 539 U.S. 306, 326 (2003).

Even assuming *arguendo* that *Turner* applies, Defendant fails to acknowledge that categorical prohibitions like the one at issue here receive heightened scrutiny. The Supreme Court has made clear that blanket policies that do not allow "case-by-case discretion" require a "closer fit between the regulation and the purpose it serves." *Thornburgh*, 490 U.S. at 412; *see also First Amend. Coal. of Arizona, Inc. v. Ryan*, 938 F.3d 1069, 1076–77 (9th Cir. 2019) (applying *Turner* but holding that a "closer fit" is required when a prison regulation "categorically banned witnesses from viewing the initial procedures of executions" and "did not leave room for case-by-case discretion").

Under either *Martinez* or *Turner*, Plaintiff's challenge to SCDC's categorical ban on publication of prisoner speech states a First Amendment claim.

## II.    Plaintiff Is Entitled to Preliminary Relief to Allow It to Publish Mr. Bowman's Communications Before South Carolina Executes Him

This Court reviews the denial of a preliminary injunction for "abuse of discretion, reviewing the district court's factual findings for clear error and . . . its legal conclusions *de novo*." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 235 (4th Cir. 2014) (internal citations omitted). Abuse of discretion occurs when a district court "misapprehends or misapplies the applicable law." *Id.*

Plaintiff's request is straightforward—to grant a preliminary injunction allowing, at a minimum, for ACLU-SC to record and publish an interview with its client Mr. Bowman while the case is pending and before the State kills him on November 29, 2024. Defendant distorts this request by claiming Plaintiff is asking for a "selective policy" and that Plaintiff somehow has not met its obligation to

establish sufficient grounds for preliminary relief, (Dkt. 24 at 34–35), but neither proposition is true. Plaintiff asks only that its First Amendment rights be protected, and it be allowed to carry out its planned speech activities, as would be permissible in any other state or the federal prison system.[8]

Plaintiff has met its burden under *Winter v. NRDC, Inc.*, 555 U.S. 7 (2008), and this Court's precedent because it has shown 1) a likelihood of success on the merits, 2) irreparable harm if preliminary relief is not granted, 3) the balance of equities favor Plaintiff, and 4) a preliminary injunction serves the public interest.

A.    <u>Plaintiff is likely to succeed on the merits of its First Amendment claims.</u>

Plaintiff is challenging a prison policy that is more speech-restrictive than any previously reviewed by this Court or the Supreme Court, and Defendant has failed to justify his draconian approach, so Plaintiff is likely to succeed in showing that the policy is unconstitutional. While courts generally show deference to prison officials' policy choices regarding security and administration, they are not entitled to such

---

[8] Two undersigned counsel from the national ACLU recently represented the 19-year-old daughter of a man facing execution in a case against the State of Missouri, which was barring her from being present at his execution because she was under the age of 21. *See generally Ramey v. Parson*, ACLU Court Cases (Nov. 29, 2022), https://www.aclu.org/cases/ramey-v-parson. The ACLU's litigation and public advocacy strategy included statements from the condemned man about his desire to have his daughter with him when he was killed. If Missouri had a policy in place like South Carolina's, it would have prevented the ACLU from including such statements in its advocacy. *See also* JA 028 (ACLU-SC's public advocacy and broadcasting an interview with a woman convicted in South Carolina for non-violent protest, who is incarcerated in a prison in Illinois).

deference "if their actions are not actually motivated by legitimate penological interests at the time they act." *Quinn v. Nix*, 983 F.2d 115, 118 (8th Cir. 1993).

Prior to the filing of this case, Defendant justified the policy as "rooted in victims' rights," JA 062, but this reason is a nonstarter under *Turner* or *Martinez*. *See supra* Part I.D. This Court need not go further because when a defendant "fail[s] to advance any penological, or other, justification," the actions are deemed protected by the Constitution. *Ali v. Dixon*, 912 F.2d 86, 90 (4th Cir. 1990).

After this litigation commenced, Defendant put forward an affidavit listing potential "adverse consequences" that might result if the policy were not in place. JA 133. There is no representation that this list of possible bad outcomes is the actual reason for the policy. The potential consequences listed were provided in a *post hoc* attempt to pass constitutional muster, but Defendant cannot rely on justifications "hypothesized or invented *post hoc* in response to litigation." *United States v. Virginia*, 518 U.S. 515, 533 (1996); *see City of Lakewood v. Plain Dealer*, 486 U.S. 750, 758 (1988) ("Without these guideposts, *post hoc* rationalizations . . . and the use of shifting or illegitimate criteria are far too easy."). Even if this Court were to accept the list of "adverse consequences" as legitimate, Defendant has not asserted that any risk to security, order, or rehabilitation is more acute in South Carolina than elsewhere, such that the state's extreme policy is justified or that a preliminary injunction is not warranted. As detailed previously, such reflexive and rote assertions by Defendant are insufficient. Dkt. 16 at 53–59; *see also supra* Part I.A.

Defendant characterizes Plaintiff's request for a preliminary injunction allowing it to undertake its planned activities with Mr. Bowman as seeking a

"selective policy" as discussed in *Saxbe*. Dkt. 24 at 34. In *Saxbe*, the Court evaluated a policy that restricted who could "enter the prisons and interview consenting inmates." 417 U.S. at 846. Notably, it did not rely on any potential risks of recording or publishing interviews. Defendant includes a block quote from *Saxbe* to support the proposition that any policy that requires prison officials to differentiate among incarcerated people and identify speech that is "likely to lead to disciplinary problems," would actually "spawn serious disciplinary and morale problems of its own by engendering hostility and resentment among inmates who were refused interview privileges granted to their fellows." Dkt. 24 at 34 (quoting *Saxbe*, 417 U.S. at 849). But this language is merely quoting a prison official's assertion, and is clearly dicta. In the very next paragraph of *Saxbe*, the Supreme Court explicitly disclaims any reliance on the prison official's justification, saying it is "unnecessary" to analyze the official's asserted penological considerations in relation to the First Amendment. 417 U.S. at 849. Instead, the Court made clear that it was basing its holding on the fact that the "visitation policy does not place the press in any less advantageous position than the public generally." *Id.*

The implications of Defendant's argument are staggering. A wide range of prison policies necessarily include some "selection" based on a risk assessment. This selection happens both based on the risk of particular speech as well as the risk posed by an individual incarcerated person. For example, prisons generally place some restrictions on books, music, and other media that can be accessed in the facility. Prison officials have been required by courts to show that any censorship of reading or listening materials meets the *Turner* test. *See, e.g., McCabe v. Arave*, 827 F.2d

17

634, 638 (9th Cir. 1987) (holding that literature advocating racial purity "cannot be constitutionally banned as rationally related to rehabilitation" unless it also advocated violence or illegal activity); *Murphy v. Missouri*, 814 F.2d 1252, 1256–57 (8th Cir. 1987) (holding that a total ban on Aryan National materials was too restrictive, but a policy limiting materials that are racially inflammatory or advocate violence would be valid). Differential treatment among incarcerated people based on their perceived risk to security and order is part of the daily work of prison administration. *See Beard v. Banks*, 548 U.S. 521, 524 (2006) (upholding highly restrictive limits on reading materials for "a group of specially dangerous and recalcitrant inmates"). This Court should not adopt Defendant's view that any "selective policy" is unworkable. Instead, it should grant Plaintiff's actual request, which is to preliminarily enjoin SCDC's unconstitutional policy as to Mr. Bowman.

B.    Plaintiff will suffer irreparable harm without a preliminary injunction.

If a preliminary injunction is not urgently granted by this Court, Plaintiff's First Amendment rights will be irreparably harmed. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury."). Here the harm is made more acute and more tragic because the window of opportunity to vigorously support Mr. Bowman's clemency petition is rapidly closing.

C.    The remaining *Winter* factors favor Plaintiff.

Plaintiff established that both the balance of equities and the public interest, the third and fourth factors under *Winter*, favor a preliminary injunction. Officials

are "in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional." *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002) (citation omitted). Here, Defendant will suffer no harm if Mr. Bowman is interviewed before he is killed. The public interest always favors the dissemination of constitutionally protected speech; indeed, here, that speech could save a man's life.

## CONCLUSION

The district court erred when it denied preliminary injunctive relief and dismissed the case without applying any First Amendment scrutiny. Because the challenged policy is unconstitutional, both facially and as applied to Plaintiff, the district court's order of dismissal should be **reversed** as to both counts and a preliminary injunction should be **granted** as to ACLU-SC's planned activities with Mr. Bowman, given his execution is scheduled for **November 29, 2024**.


Dated: October 22, 2024                    Respectfully submitted,

                                           **ACLU OF SOUTH CAROLINA**

                                           */s Allen Chaney*
                                           Allen Chaney
                                           Fed. Id. 13181
                                           P.O. Box 1668
                                           Columbia, SC 29202
                                           Tel: (843) 282-7953
                                           achaney@aclusc.org

19

**ACLU FOUNDATION**
Emerson J. Sykes
ACLU Speech, Privacy, and Technology
Project
125 Broad Street, 18th Floor
New York, NY 11230
Tel: (212) 549-2500
esykes@aclu.org/

David C. Fathi*
ACLU National Prison Project
915 15th Street NW, 7th Floor
Washington, DC 20005
Tel: (202) 393-4930
dfathi@aclu.org

Corene T. Kendrick
ACLU National Prison Project
425 California St., Ste 700
San Francisco, CA 94104
Tel: (202) 393-4930
ckendrick@aclu.org

*Attorneys for Plaintiff*

* Not admitted in D.C., practice limited
to federal courts.

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 5,237 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally-spaced typeface using Microsoft Word in 14-point font size, Times New Roman type style.

**ACLU OF SOUTH CAROLINA**

*/s/ Allen Chaney*

Counsel for Plaintiff

October 22, 2024